Opinion issued November 23, 2009 

 



 







In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-06-00759-CV

____________


WPS, INC., Appellant


V.


ENERVEST OPERATING, L.L.C., Appellee






On Appeal from the 127th District Court

Harris County, Texas

Trial Court Cause No. 2004-35036






MEMORANDUM OPINION Appellant, WPS, Inc. ("WPS"), appeals a final judgment, rendered upon trial
to the jury and to the bench, in favor of appellee, EnerVest Operating, L.L.C., for
actual damages and attorney's fees. We determine whether (1) the trial court abused
its discretion in charging the jury; (2) legally and factually sufficient evidence
supported the verdict; (3) various contractual provisions precluded or limited
EnerVest's recovery; (4) the trial court correctly concluded that EnerVest provided
the insurance required by the parties' contract; and (5) WPS preserved or adequately
briefed certain of its appellate challenges. We affirm.

The Parties


 EnerVest was an oil-and-gas acquisition company. EnerVest hired Baker
Energy ("Baker") to run its day-to-day well operations. WPS made compressor
packages--skids, compressors, and related machinery--which compress natural gas
to inject into low-pressure oil or gas wells to improve production. EnerVest had a
standing "Master Service Contract" (the "MSC"), dated December 2, 2002, with
WPS. In December 2003, EnerVest rented a compressor package from WPS for its
Garden Island Bay facility. The parties signed two contracts as part of this rental: (1)
a "Rental Agreement" to lease the compressor and (2) a "Maintenance Services
Contract" for service of the compressor package, along with an addendum thereto. 

The Dispute


 The WPS compressor was first run on February 5, 2003. Between that date and
March 25, 2003, the date of the fire giving rise to this suit, the compressor had many
problems and was frequently out of service. The parties dispute which of them was
responsible for the problems. On March 25, the Baker contractors at the site heard
a large gas leak. They spent 15 to 20 minutes trying to locate the leak. After they had
determined that the leak was coming from the area of the WPS compressor, they
decided to start the back-up compressor and to shut down the WPS one; however,
before they could do so, the gas ignited from the heat of the WPS compressor,
causing a fire. 

 No one disputes that a failed needle valve in the WPS compressor caused the
gas leak, but they dispute (1) whether the needle valve failed because it was defective
(EnerVest's position); (2) whether, instead, EnerVest improperly installed the
compressor, causing vibrations that in turn broke the valve, causing the leak (WPS's
position); and (3) whether the Baker contractors caused the fire because they
improperly failed to shut off the compressor when they first heard the leak (WPS's
position). 

 The fire burned for hours, destroying the compressor. EnerVest wanted WPS
to provide a new compressor, to remove the damaged one, and to reimburse EnerVest
its rental pre-payments for the months that the compressor was damaged; WPS
wanted EnerVest to pay for the compressor to be fixed. 

The Procedural History


 The parties eventually sued each other. EverVest sued WPS for (1) breach of
the Rental Agreement because WPS "promised a working compressor and delivered
a compressor that never performed as warranted and ultimately failed to perform at
all"; (2) breach of the MSC's express-warranty provision; and (3) breach of the
Maintenance Services Contract addendum's 95%-uptime guarantee. EnerVest sought
declarations that (1) WPS was obliged under the MSC to indemnify EnerVest; (2)
EnerVest had no obligation to repair or to replace the compressor; and (3) because of
the fire, EnerVest has no further obligations to WPS under any contract. WPS
counterclaimed for (1) breach of the Rental Agreement, including failure to pay rent,
failure to obtain insurance, and failure to repair the compressor, and (2) negligence,
including failure to install the compressor properly and to turn off the compressor
after the leak. WPS also sought damages under the theory of promissory estoppel for
EnerVest's "failing to abide by its promise to obtain insurance acceptable to WPS."

 Upon cross-motions for summary judgment, the trial court ruled that the Rental
Agreement's indemnity clause applied and that EnerVest was obligated "to provide
insurance to cover the loss in question," although the court verbally altered the latter
ruling at the start of trial to be that EnerVest was obliged to procure the insurance
required by the Rental Agreement. EnerVest's claim for breach of the MSC's
express-warranty provision and its requests for declarations were not submitted to
the jury or the trial court. EnerVest's claim for breach of the Maintenance Services
Contract addendum's 95%-uptime guarantee was submitted to the jury, which found
against EnerVest. The trial court also submitted a jury question on EnerVest's breach
of the Rental Agreement--albeit not in broad-form manner and inquiring about an
"internal defect" to the compressor--on which the jury found in EnerVest's favor. 
None of WPS's claims were submitted to the court or jury except for its claim that
EnerVest had breached the Rental Agreement by failing to procure proper insurance;
the parties submitted this one claim to the trial court, which ruled against WPS. The
parties also submitted the issue of attorney's fees to the trial court, which ruled in
EnerVest's favor and awarded it fees. The trial court entered findings of fact and
conclusions of law and overruled WPS's post-judgment motions. WPS appeals.

Jury Charge Issues


 In its issue "A," WPS raises three complaints about the jury charge.

 A trial court must give "such instructions and definitions as shall be proper to
enable the jury to render a verdict." Tex. R. Civ. P. 277 (emphasis added). An
instruction is proper if it assists the jury, accurately states the law, and is supported
by the pleadings and the evidence. See Tex. Worker's Comp. Ins. Fund v.
Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000); Tex. R. Civ. P. 278. A court is under
no obligation to submit a requested jury instruction or definition that fails to meet
these criteria. See Mandlbauer, 34 S.W.3d at 912.

A. "Proper Use" Predicate to Jury Question 1

 Jury Question No. 1 read:


 Was the cause of the March 25, 2004, fire an internal defect to the
Compressor Package as furnished by . . . WPS, Inc?


 You are instructed that by the terms of the rental agreement
between WPS, Inc. and EnerVest,


 EnerVest is responsible for the complete installation of the
"Compressor Package."


 WPS asserts that the trial court erred by "failing to include a necessary
predicate for the finding of a 'defect' that being proper use of the equipment in
question after its delivery and prior to failure." This issue was preserved to the extent
that it mirrors the hand-written instruction that WPS proffered, and which the trial
court refused, at the charge conference: "Where a plaintiff relies solely on
circumstantial evidence to establish a defect, the plaintiff must present evidence of
proper use of the product. Plas-Tex v. U.S. Steel, 772 S.W.2d 442." See Tex. R. Civ.
P. 278 (requiring that complaint of failure to submit instruction be in writing). 

 WPS's whole argument rests on its view that, although EnerVest sued for
breach of the Rental Agreement, legal concepts normally applicable only to claims
for breach of the implied warranty of merchantability should have been incorporated
into the charge under the facts of this case. Specifically, WPS argued here and below
that it could not be liable for breach of the Rental Agreement unless the compressor's
failure resulted from an internal defect that existed at the time of delivery, rather than
from EnerVest's later, improper use of the compressor. Accordingly, in its objections
and charge submissions, WPS relied on Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d
442, 444 n.5 (Tex. 1989) ("In a case where the plaintiff relies solely on circumstantial
evidence to establish a defect, the plaintiff must present evidence of proper use of the
goods to make a prima facie showing of the defect."), and Texas Business and
Commerce Code section 2A.212(b)(3) (Vernon 1994) (entitled, "Implied Warranty
of Merchantability"; providing that to be merchantable, goods must be at least such
as "are fit for the ordinary purposes for which goods of that type are used"). 

 EnerVest did not allege or pursue a statutory breach-of-implied-warranty claim,
however. Rather, it alleged, in relevant part, breach of the Rental Agreement because
"WPS promised a working compressor and delivered a compressor that never
performed as warranted and ultimately failed to perform at all." The petition also
alleged that WPS had breached the MSC's express warranty that the compressor
would be "free from defects in workmanship and materials" for one year and the
Maintenance Services Contract addendum's 95%-uptime guarantee. (1) Based on
EnerVest's opening statement, the evidence that it presented in its case in chief, the
parties' and court's discussions on WPS's motions for directed verdict, EnerVest's
charge-conference statements, and its closing argument, it is evident that EnerVest
was pursuing breaches of the various contracts' express terms, not claims based on
a breach of the implied warranty of merchantability. 


 Likewise, the discussions upon WPS's motions for directed verdict indicate
that the trial court understood EnerVest as asserting claims for breach of express
contract (including the Rental Agreement), not for breach of the implied warranty of
merchantability. (2) The trial court nonetheless concluded that the pivotal issue to
submit to the jury for whether WPS had breached the Rental Agreement was whether
the compressor was internally defective or not, so that "we will ask the jury a very
specific question." 

 The trial court then created this "very specific" breach-of-contract question by
piecing together jury questions that both sides had proposed, only some of which
related to EnerVest's claim for breach of the Rental Agreement. For example, the
trial court appears to have adapted WPS's proposed question for EnerVest's claims
arising from the compressor's rental: "Did the compressor package leased by WPS,
Inc. to EnerVest for the Garden Island Bay platform contain a defect upon delivery?" 
The trial court also appears to have incorporated elements of EnerVest's proposed
questions relevant to insurance coverage, or perhaps to breach of the MSC's express
warranty provision, all of which asked whether the fire was caused by an "internal"
deficiency or defect. (3) Of course, EverVest had not proposed the above questions for
its claim for breach of the Rental Agreement: for that claim, EnerVest had proposed
a broad-form breach-of-contract question. However, because the trial court believed
that ascertaining whether the Rental Agreement was breached required the jury to
decide whether the compressor was internally defective, it adapted the "defect"
question proposed by WPS, and the questions that EnerVest had proposed for
insurance coverage or breach of express warranty in the MSC, into its own question
concerning breach of the Rental Agreement, i.e., Jury Question No. 1.

 Given the nature of EnerVest's claim, the court's and parties' discussions
during trial, and WPS's specific complaints at trial and on appeal, (4) we cannot say that
it was an abuse of discretion for the trial court to have rejected definitions and
instructions that were relevant solely to claims for breach of the implied warranty of
merchantability arising under statute--even though its question asked about an
internal defect--when the question presented a breach-of-contract claim. Put another
way, it was not an abuse of discretion to reject an instruction that would have
converted a breach-of-contract claim, however submitted, into one for breach of an
implied statutory warranty.

 We overrule this challenge under WPS's issue A.

B. Failure to Define "Defect" in Jury Question No. 1


 Also under its issue A, WPS argues that the trial court erred in "failing to
include a definition of 'defect' in the charge, particularly to Question 1."

 WPS contends that this challenge was preserved in two ways. First, at the
charge conference, WPS argued: "Also, we object that the term 'defect' is not defined
in the Charge, Your Honor; and for that reason, it's improper." However, WPS did
not tender a written definition or even explain what the definition should be. This
does not preserve error. See Tex. R. Civ. P. 273 ("Either party may present to the
court and request written . . . instructions . . .); Tex. R. Civ. P. 276 ("When an
instruction . . . is requested and the provisions of law have been complied with and
the trial judge refuses the same, the judge shall endorse thereon 'Refused,' and sign
the same officially. . . . Such refused . . . instruction . . . , when so endorsed shall
constitute a bill of exceptions . . . and such procedure shall entitle the party requesting
the same to have the action of the trial judge thereon reviewed without preparing a
formal bill of exceptions."); Tex. R. Civ. P. 278 ("Failure to submit a definition or
instruction shall not be deemed a ground for reversal of the judgment unless a
substantially correct definition or instruction has been requested in writing and
tendered by the party complaining of the judgment.") (emphasis added).

 Second, WPS relies on the instruction included within its proposed charge. 
WPS did not obtain the court's endorsement of refusal on it, however. See Tex. R.
Civ. P. 276 (requiring tendering of definition to court); Tex. R. Civ. P. 278 (providing
that court's written refusal on definition creates conclusive presumption that
definition was presented at proper time and that proponent excepted to same and
entitling party who follows procedure to have court's ruling reviewed without formal
bill of exceptions). In any event, the instruction tracked language applicable to the
implied warranty of merchantability, which was not EnerVest's claim.

 We overrule this challenge under issue A.

C. Predication of Jury Question No. 2


 Jury Question No. 2 read:


 If you answered "Yes" to Jury Question No. 1, answer the
following question. Otherwise, do not answer the following
question.


JURY QUESTION NO. 2



 What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate EnerVest for its damages, if any, resulting
from the conduct you have found in answer to Jury Question No.
1?


 [instructions concerning the elements of damages and interest
followed]


 In its final challenge under issue A, WPS contends that the trial court erred in
making "Jury Question No. 2 . . . predicated solely upon Question No. 1 with no
allowance for consideration of the failure of the Enervest (Baker) operators to
promptly shut down the Compressor upon discovery of the natural gas leak."

 At the charge conference, however, this colloquy occurred:

 WPS: We object to Question No. 3 [sic: should be No. 2], Your
Honor, because it's only predicated on Question No. 1. In
other words--


 Court: Overruled.


 * * *


 WPS: Again, Your Honor, we would reemphasize Jury Question
No. 2. It lacks additional predicates; in other words, more
must be shown than a defect in order to get to Question No.
2.


 Court: Overruled.


 An objection can preserve error in a defective instruction. Spencer v. Eagle
Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994). However, the objection here,
in addition to lacking specificity, does not comport with the appellate challenge: that
the instruction is defective because it makes "no allowance for consideration of the
failure of the Enervest (Baker) operators to promptly shut down the Compressor upon
discovery of the natural gas leak." See In re A.V., 113 S.W.3d 355, 362 (Tex. 2003)
(holding that complaint concerning charge was waived when only different objections
were raised to charge at trial); see also Tex. R. Civ. P. 274; Castleberry v. Branscum,
721 S.W.2d 270, 276-77 (Tex. 1986) (overruled on other grounds by statute)
(requiring that objection be sufficiently specific for basis to be understood).

 We overrule this final challenge under WPS's issue A.


Legal- and Factual-Sufficiency Issues


A. WPS's Challenges

 Under its issue "B," WPS argues that the trial court erred in denying its
motions for directed verdict for the reason that no evidence of a defect in the
compressor's valve existed. Under its issue "C," WPS raises legal- and factual-sufficiency challenges to the following four matters that it contends were elements
under Jury Question No. 1: (1) that a defect in the compressor existed, (2) that that
defect existed at the time of delivery, (3) that EnerVest used the compressor properly,
and (4) that the defect caused the fire. All of these challenges were preserved by
either motions for directed verdict, for JNOV, or for new trial or by charge objections. 

B. Standards of Review

 When made on an evidentiary basis, rulings on motions for directed verdict and
for JNOV are reviewed under the same legal-sufficiency test as are appellate
no-evidence challenges. See City of Keller v. Wilson, 168 S.W.3d 802, 823, 827
(Tex. 2005). 

 When, as here, an appellant attacks the legal sufficiency of an adverse finding
on an issue for which it did not have the burden of proof, it must demonstrate that
there is no evidence to support the adverse finding. Croucher v. Croucher, 660
S.W.2d 55, 58 (Tex. 1983). Such a no-evidence challenge will be sustained when
"'(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to prove
a vital fact, © the evidence offered to prove a vital fact is no more than a mere
scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.'" 
King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003) (quoting Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)).

 In our legal-sufficiency review, "we must view the evidence in a light that
tends to support the finding of disputed fact and disregard all evidence and inferences
to the contrary." Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709 (Tex. 2003).
Nonetheless, "[t]he final test for legal sufficiency must always be whether the
evidence at trial would enable reasonable and fair-minded people to reach the verdict
under review . . . . [L]egal-sufficiency review in the proper light must credit
favorable evidence if reasonable jurors could, and disregard contrary evidence unless
reasonable jurors could not." Wilson, 168 S.W.3d at 827.

 In reviewing a factual-sufficiency challenge to a finding on an issue on which
the appellant did not have the burden of proof, we consider and weigh all of the
evidence and set aside the judgment only if the evidence that supports the challenged
finding is so weak as to make the judgment clearly wrong and manifestly unjust. 
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We must examine both the evidence
supporting and that contrary to the judgment. See Dow Chem. Co. v. Francis, 46
S.W.3d 237, 241 (Tex. 2001).

 The fact finder is the sole judge of witnesses' credibility and the weight to be
given their testimony, and the fact finder may choose to believe one witness over
another. Wilson, 168 S.W.3d at 819 (legal sufficiency); Golden Eagle Archery, Inc.
v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency). Because it is the
fact finder's province to resolve conflicting evidence, we must assume that the fact
finder resolved all evidentiary conflicts in accordance with its decision if a reasonable
human being could have done so. See Wilson, 168 S.W.3d at 820 (legal sufficiency);
Jackson, 116 S.W.3d at 761 (factual sufficiency). An appellate court may not impose
its own opinion to the contrary of the fact finder's implicit credibility determinations.
Wilson, 168 S.W.3d at 819 (legal sufficiency); Jackson, 116 S.W.3d at 761 (factual
sufficiency).

 "When a party in a civil case raises a proper objection to an improper jury
charge or instruction, we measure the sufficiency of the evidence against the jury
charge or instruction that should have been given." Murphy v. Am. Rice, Inc., No. 01-03-01357-CV, 2007 WL 766016, at *16 (Tex. App.--Houston [1st Dist.] Mar. 9,
2007, no pet.) (citing St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 530 (Tex. 2002)). 
"However, if no objection is made, or if an incorrect objection is made, we measure
the sufficiency of the evidence against the jury charge or instruction actually given." 
Id. 


 Because we have already held that the trial court did not abuse its discretion
in refusing WPS's proffered instructions, we measure the sufficiency of the evidence
against the charge actually given. See id. Accordingly, because WPS's evidentiary
challenges based on the defect's existence at the time of delivery and on EnerVest's
proper use of the compressor measure sufficiency against language that was not
included in the charge, WPS cannot base its sufficiency challenge on them. (5)

C. Discussion

 The charge asked whether "the cause of the . . . fire [was] an internal defect to
the Compressor Package as furnished by . . . WPS, Inc." Because "defect" was
undefined in the charge, we look to the term's commonly understood meaning for our
sufficiency review. See EMC Mortgage Corp. v. Jones, 252 S.W.3d 857, 869 (Tex.
App.--Dallas 2008, no pet.); Kroger Co. v. Brown, 267 S.W.3d 320, 323 (Tex.
App.--Houston [14th Dist.] 2008, no pet.). The commonly understood meaning of
"'defect' is 'an irregularity in a surface or a structure that spoils the appearance or
causes weakness or failure.'" Coldwell Banker Whiteside Assocs. v. Ryan Equity
Partners, Ltd., 181 S.W.3d 879, 886 (Tex. App.--Dallas 2006, no pet.) (quoting
Webster's Third New Int'l Dictionary 591 (1981)). 

 1. Legal Sufficiency

 The following evidence, viewed in the light most favorable to the verdict,
supports the finding that the compressor contained an internal defect that caused the
fire. The source of the fire was a needle valve that broke, causing gas to leak, which
the WPS compressor engine ignited. It was WPS that designed or put together the
"compressor package; engine, compressor, and . . . the skid" and that selected the
valves, including the one that broke. Prior to the fire, the lead Baker operator at the
Garden Island Bay facility "did not think or believe that there was a vibration
problem with" WPS's compressor, nor did "WPS, EnerVest or anybody" suggest to
him that such a problem existed. 

 Before the compressor package's installation, Ross Simon, WPS's salesman,
inspected the platform on which the unit would be installed. When Buck Wells,
EnerVest's production foreman, asked Simon before installation what would "keep
this unit from walking off" of its platform, Simon advised that the unit's weight
would do so and did not suggest that it needed to be bolted or welded to the platform. 
No one from WPS had advised EnerVest before the fire that the compressor had to
be welded or bolted to the skid, that it was improperly installed, or that it should not
have been installed on the platform in the way that it was, despite WPS's mechanics
having been on site repeatedly after installation. (6) EnerVest would have secured the
compressor package had WPS recommended it. Shelton Langley, Baker's operator,
never heard anyone from EnerVest or Baker express that there might be vibration
problems with the unit, and he had no reason to believe that there were any. The non-WPS compressor that replaced the WPS compressor at the Garden Island Bay facility
did not experience the same problems that the WPS compressor had. Furthermore,
Wells testified that compressors did "not usually" have the type of harmonic vibration
problems that could cause valve breakage and that he had never before encountered
such vibration problems from a platform-mounted compressor. Likewise, Buddy
Adams, another Baker operator, had never had any experience in the past with
vibrations causing breakages on compressors or their packages. And Adams
confirmed that no one, including anyone from Enervest and WPS, had suggested prior
to the fire that the unit had a vibration problem. (7)

 Another WPS compressor unit that EnerVest used at its separate Bay de Chene
facility had an identical valve break in the exact same way as had the one at the
Garden Island Bay facility. In response to this break, WPS changed out all of the
needle valves on the Bay de Chene unit because WPS did not want to "take a chance
if that was a bad design or a bad batch of valves . . . ." Although the Bay de Chene
unit was not welded or tied down either, WPS had told EnerVest that as long as it was
not run at more than a thousand RPMs, it could be "left as is." Additionally,
correspondence from Killingsworth concerning this unit indicated that "[t]here have
been comments of vibration on the unit at 1300 plus RPMs but nothing out of the
ordinary to require documentation or further inspection." Killingsworth testified that
nothing indicated that the Bay de Chene unit had any sort of harmonic vibration
problem and that, had there been such an indication or apparent problem, he would
have "made a change on it." After the valve failure in the Bay de Chene unit, WPS
did a vibration study on that unit and concluded that the "vibration levels [were]
acceptable," albeit "on the high side of the acceptable limit." Similarly, the Garden
Island Bay facility WPS compressor was run "in the neighborhood of 1250 to 1350
[RPMs], depending on the load."

 The Baker contractors allowed the Garden Island Bay facility compressor to
continue running after the leak happened in order to locate the source of the leak
through sound, for which continued pressure was required. They were not authorized
to shut the compressor down until they had pinpointed the problem's source. The
Baker contractors handled the gas leak appropriately and "on a professional level,"
and Wells had no criticism of their waiting to shut off the WPS compressor in an
attempt to isolate the leak.

 The above evidence, albeit disputed, is some evidence that the valve was
defective; that it did not break because of vibration arising from EnerVest's improper
installation of the unit; that if it did break from vibration, then WPS's not having fully
filled the skid with concrete may have contributed to that result; and that the Baker
contractors acted properly in allowing the compressor to run after a leak was detected,
so that their actions were not a superseding cause of the fire. Accordingly, we hold
that there was legally sufficient evidence to support the jury's answer to Jury
Question No. 1.

 2. Factual Sufficiency

 a. deficiency

 In support of its factual-sufficiency challenge to the evidence showing a
deficiency, WPS relies on the testimony of (1) its engineering expert, John Thomas
Steeper, and (2) its president and owner, Seth Williamson. Williamson testified that
WPS still used the brand of valve that broke and that some of his customers
specifically requested that brand, implying that the brand was of good quality. 
However, EnerVest presented evidence that the same brand valve broke on both WPS
compressors; that WPS replaced all of the valves on the Bay de Chene unit as a
precaution; and that vibration did not lead to the valves' breakage.

 WPS also relies on Steeper's testimony that the fire was caused by the failure
of the valve "at a root of one of the threads." He opined that the break was caused by
fatigue, which he in turn opined was caused by vibration. He observed that in the
case of valves such as that one, there are "some miscontinuities in the threads," which
is where failures normally occur; however, that did not render the valve defective. 
He stated that the testing that he performed on the valve showed that a fatigue failure
had occurred "and it was not . . . a defective part." Steeper testified that the Garden
Island Bay compressor's installation was not what he would consider a "normal
installation" and that he "question[ed]" it because most compressors of comparable
size were bolted or welded down, resulting in "less chance" of vibration. He also
"suspect[ed]" that the Bay de Chene compressor's valve had broken from vibration.

 However, Steeper would not say that the Garden Island Bay unit's installation
was improper, and he could not say that its valve would not have failed if the unit had
been bolted to the platform. He also admitted that he could not observe the Garden
Island Bay facility compressor functioning because it had burned, that he did not
know at what RPM the Bay de Chene facility compressor had been running when the
identical needle valve broke, that he was not sure whether the broken equivalent
valve in the Bay de Chene unit had been checked for vibration, and that his
conclusion as to why the Bay de Chene unit's valve broke was probably speculation. 
Steeper also admitted that adding weight to the compressor package--for example,
by putting concrete in the skid--could make a difference in dampening vibration. He
admitted that he had not "discussed" whether WPS typically added concrete to the
skid package. Steeper also admitted that in his earlier deposition, he had indicated
that the valve "likely had a deficiency in it to start the crack," although he explained
at trial that he had not meant defect by the use of the word "deficiency." He also
testified by deposition that the test results on the break showed a "stress riser," which
"could have a ding, a gouge, or any number of things." Finally, Steeper testified that
WPS ought to know whether its compressor could be installed on the platform or not.

 Given the entirety of Steeper's testimony, we cannot say that EnerVest's
contrary evidence of an internal defect is so weak as to render the jury's answer to
Jury Question No. 1 clearly wrong and manifestly unjust. See Cain, 709 S.W.2d at
176. We thus hold that the evidence was factually sufficient to show an internal
defect.

 b. causation

 In support of its factual-sufficiency challenge to the evidence showing
causation, WPS relies on (1) the fact that the Baker contractors did not promptly shut
down the compressor, which WPS contends was done to avoid "loss of production
. . . for a few hours," and (2) Courville's opinion that a compressor should
immediately be shut down when a gas leak develops and that a gas leak can be
located even when the compressor is off.

 The jury was entitled to believe the testimony of the Baker contractors--that
the leak could be found only by leaving the compressor running and that their leaving
it running was thus reasonable--and to disbelieve Courville's opinion to the contrary. 
Given the state of the record, we cannot say that the evidence concerning causation
that supports the jury's answer to Jury Question No. 1 is so weak as to make the
verdict clearly wrong and manifestly unjust. See Cain, 709 S.W.2d at 176. We thus
hold that the evidence was factually sufficient to show causation.

 3. Conclusion

 We overrule WPS's issues B and C in their entirety.

Issues Concerning Limitation of WPS's Liability to EnerVest


 Under its issues "D" and "G," WPS argues that three contractual provisions
precluded or limited its liability to EnerVest. (8)


A. The Rental Agreement's Indemnity Provision

 The Rental Agreement contained the following indemnity provision:


 13. Indemnification


 * * *


 [EnerVest] covenants and agrees to fully defend, protect,
indemnify, and hold harmless [WPS], . . .from against each and
every claim, demand, or cause of action and any liability, cost,
expense . . . , damage or loss therewith, which may be made or
asserted by [EnerVest], . . . on account of personal injury, death,
or property damage caused by, arising out of, or in any way
incidental to, or in connection with the performance of the work
herein, except such as may result from the negligence or willful
misconduct of [WPS]. . . .


(Emphasis added.) The trial court entered a conclusion of law that "[t]he indemnity
provision in ¶ 13 of the Rental Agreement does not preclude recovery by EnerVest
in this case for the damages submitted to the jury by jury question." 

 Under its issue D, WPS argues that "since there was no [jury] finding of
negligence or willful misconduct by WPS, Enervest is required to indemnity [sic] and
hold harmless WPS against any claims by EnerVest arising out of this contract." 
WPS's argument under its issue G is similar: "Because there was no finding by the
jury as to whether or not the 'defect' referenced in Jury Question No. 1 was
occasioned by the 'negligence or willful misconduct of [WPS]' there were
insufficient findings upon which the trial court could base" its conclusion of law.


 WPS cites no authority under issue G, and the only authority cited under issue
D for the relevant challenge is that concerning the standard of review for challenges
to findings of fact and conclusions of law. For this reason alone, the appellate
challenge is unmeritorious. See Tex. R. App. P. 38.1(i) ("The brief must contain a
clear and concise argument for the contentions made, with appropriate citations to
authorities and to the record."); Howeth Invs., Inc. v. City of Hedwig Village, 259
S.W.3d 877, 902 (Tex. App.--Houston [1st Dist.] 2008, pet. denied) (relying on
predecessor to rule 38.1(i) to overrule issue containing totally inadequate legal
analysis and no citation to authority). 

 In any event, it is not surprising that there were no jury questions submitted on
WPS's negligence or willful misconduct because WPS did not request them. It was
WPS's burden to raise and to obtain any necessary findings on this liability-limiting
affirmative defense, which had not even been pleaded before trial. See Cont'l
Holdings, Ltd. v. Leahy, 132 S.W.3d 471, 475 (Tex. App.--Eastland 2003, no pet.)
("The limitation-of-liability provision in the contract constitutes an affirmative
defense."); cf. Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex. 1988)
(providing that defendant, as proponent of limitations affirmative defense, had burden
to plead, to prove, and to obtain finding on that defense); Freeman v. Carroll, 499
S.W.2d 668, 670 (Tex. Civ. App.--Tyler 1973, writ ref'd n.r.e.) ("Appellant did not
request special issues raising the question of an express contract . . . . Since it is the
defendant's duty to request proper issues inquiring into affirmative defenses, we
cannot say the trial court erred by not submitting an issue inquiring into the existence
of an express contract [as an affirmative defense to plaintiff's claim of quantum
meruit] . . . ."). WPS does not discuss why its failure to obtain such jury findings
should preclude judgment for EnerVest. Additionally, WPS does not explain how
EnerVest's claim for breach of the Rental Agreement is a "claim . . . on account of
personal injury, death, or property damage," as required for this indemnity provision
to apply.

 We overrule this challenge under WPS's issue D, and we overrule its issue G
in its entirety.

B. The MSC's Liability-Limitation Provision

 Paragraph 16 of the MSC provided:


 16. WARRANTIES


 16.1 [WPS] warrants only title to the products, supplies and
materials, and that the same are free from defects in workmanship and
materials for a period of one (1) year from the date of delivery. THERE
ARE NO WARRANTIES, EXPRESS OR IMPLIED, OF
MERCHANTABILITY, FITNESS OR OTHERWISE WHICH
EXTEND BEYOND THOSE STATED IN THE IMMEDIATELY
PRECEDING SENTENCES [sic]. [WPS's] liability and EnerVest's
exclusive remedy in any breach of warranty arising out of the sale or use
of any products, supplies or materials is expressly limited to the
replacement of such products, supplies or materials on their return to
[WPS] or to the allowance to EnerVest of credit for the cost of such
items. 


 . . . 

 Under its issue D, WPS contends that if the jury's answer that the compressor
contained an internal defect can be construed as a finding of liability on EnerVest's
breach-of-express-warranty claim based upon the MSC's paragraph 16, then WPS's
liability is limited by the same paragraph of the same agreement. This challenge was
raised in WPS's motions for JNOV, new trial, and directed verdict.

 WPS offers no authority in support of this challenge, nor does it explain how
the MSC's provisions control in light of the trial court's conclusion of law that "[t]he
Rental Agreement controls in this case as ruled on summary judgment." For these
reasons alone, the challenge is not sustainable.

 Additionally, the trial court granted WPS's directed verdict on this ground,
ruling that (1) the Rental Agreement applied, but that (2) if EnerVest pursued its
breach-of-express-warranty claim based on the MSC's paragraph 16, then the
limitation-of-liability portion of that paragraph would also apply. The following
discussion between the trial court and EnerVest ensued: 

 Court: [I]f [EnerVest] is correct that the Master Service [Contract]
contains rights, it also contains the remedy [of] limitations. 
And so if that's what you [WPS] are seeking a directed
verdict that any claim by [EnerVest] under Section 15 [sic]
of the Master Service [Contract], limitation of liability
applies, yes, it does.


 EnerVest: That just gets us to zero on that.



 Court: I think it does. So there we are. Claim is under that, then
the remedies are under that, too. So I think we are back to
the lease agreement [Rental Agreement]."


(Emphasis added.) The trial court then reiterated its ruling that if EnerVest pursued
its breach-of-express-warranty claim based on the MSC's paragraph 16, the
paragraph's limitation-of-liability provision would also apply. The discussions
during the hearings on EnerVest's motion for entry of judgment and WPS's post-judgment motions also indicate that the trial court considered the case to have been
tried on the Rental Agreement.

 The applicable jury issue (Jury Question No. 1)--"Was the cause of the . . . fire
an internal defect to the Compressor Package as furnished by . . . WPS, Inc.?"--was
qualified by an instruction that indicated that the Rental Agreement applied at least
in part. Based on the directed-verdict discussion and ruling, this jury question, and
the discussions at the post-verdict hearings, it appears that at the time of submission
to the jury, EnerVest was no longer pursuing breach of the MSC's express warranty
provision and that Jury Question No. 1 was intended to encompass EnerVest's claim
for breach of the Rental Agreement. 

 We overrule this challenge under WPS's issue D.

C. The Rental Agreement's Force Majeure Provision

 In the final argument under its issue D, WPS contends that the force majeure
provision of the Rental Agreement "relieves WPS from any obligations under the
rental Agreement because clearly, compliance with the terms and conditions of the
Rental Agreement were [sic] prevented by the fire which destroyed [the] compressor."

 WPS does not indicate how it preserved this complaint, and we have not found
it in its motions for directed verdict, for JNOV, or for new trial, in the record from the
hearings on these motions or from EnerVest's motion for entry of judgment, or in
WPS's charge objections. The challenge is therefore waived. See Tex. R. App. P.
33.1(a)(1). Moreover, WPS's entire appellate argument is set out above; there is no
analysis or citation to authority, and we would thus not consider its merits in any
event. See Tex. R. App. P. 38.1(i); Howeth Invs., Inc., 259 S.W.3d at 902. 

 We overrule this final challenge under WPS's issue D.

Challenges to the Conclusion of Law That EnerVest Complied With Its


Obligation to Purchase Insurance



 Upon cross-motions for summary judgment, the trial court ruled that EnerVest
was "obligated to provide insurance to cover the loss in question." During trial, the
trial court clarified that ruling:

 The ruling on the merits by the Court is that the rental agreement
governs. And in looking at, pretrial, Rule 166, I'll tell you that the
Court construes the agreement to require EnerVest . . . to comply with
the rental agreement which includes requiring [sic] the insurance policy
as specified in that contract.


The parties' discussion at that time also indicated that the court would try the issue
of whether the policy that EnerVest obtained complied with the Rental Agreement. 
Later during trial, outside the jury's presence, the court received evidence on this
issue. After judgment, the trial court rendered the following relevant findings of fact
and conclusions of law:

PRELIMINARY FINDINGS OF FACT



 1. EnerVest purchased a policy of external physical loss all-perils
insurance, . . . with an effective date of October 1, 2003 and an
expiration date of October 1, 2004 (hereinafter "the Policy"),
which covered the WPS compressor package at issue. . . .


 2. Underwriters at Lloyd's issued a certificate of insurance dated
February 18, 2004 . . . designating WPS as an "additional insured
. . . on all policies where and to the extent required by written
contract."


 3. WPS has filed a direct action against Underwriter's at Lloyd's . . .
, which is pending in Louisiana . . . , in which WPS has admitted
that the Policy covers the compressor package at issue.


 . . .


CONCLUSIONS OF LAW



 1. The Rental Agreement controls in this case as ruled on summary
judgment.


 2. Article 19 of the Rental Agreement . . . obligated EnerVest to
"furnish external physical loss all-perils insurance coverage on
the equipment."


 3. The term all-risks and all-perils does not indicate coverage for
any event of loss, but instead describes a type of insurance policy
that is different from a traditional named perils policy.


 4. All-risks or all-perils policies are designed only to cover damages
caused by external forces.


 5. EnerVest complied with its obligation under Paragraph 19 of the
Rental Agreement by providing a policy of external physical loss
all-perils insurance coverage on the equipment.


 . . .


(Emphasis in original.) It was clear--from the trial discussions, the court's findings
and conclusions, and recitations in the final judgment--that the trial court did not try
the issue of coverage. 

 In its issue "E," WPS contends that the trial court erred in these rulings and in
rendering the above findings and conclusions.

 The Rental Agreement required that EnerVest "furnish external physical loss
all-perils insurance coverage on the equipment for a coverage value acceptable to
[WPS]." No Texas case defines "external physical loss all-perils insurance." 
However, an all-risks or all-perils insurance policy is "one in which the insurer
undertakes the risk for all losses of a fortuitous nature, which, in the absence of fraud
or other intentional misconduct of the insured, is not expressly excluded in the
agreement." Muniz v. State Farm Lloyd's, 974 S.W.2d 229, 234 (Tex. App.--San
Antonio 1998, no pet.); see Andrew C. Hecker Jr. & M. Jane Goode, Wear & Tear,
Inherent Vice, Deterioration, Etc.: the Multi-Faceted All-Risk Exclusions, 21 Tort &
Ins. L.J. 634, 634 (1986) [hereinafter "Hecker & Goode"]. Some courts have equated
a fortuitous loss, within the meaning of an all-risk insurance policy, with a loss
arising from external or extrinsic forces, so that losses resulting from an inherent
quality or defect in the item insured are not within the scope of coverage. See SMI
Realty Mgmt. Corp. v. Underwriter's at Lloyds, London, 179 S.W.3d 619, 627 n.3
(Tex. App.--Houston [1st Dist.] 2005, pet. denied) (noting same); Goodman v.
Fireman's Fund Ins. Co., 600 F.2d 1040, 1041-42 (4th Cir. 1979) (in interpreting
clause "against all risks of physical loss or damage from any external cause," stating,
"The addition of the phrase 'external cause' to the 'all risks' clause constitutes no real
limitation on the scope of the latter. If the loss did not result from inherent defect,
ordinary wear and tear, or intentional misconduct, its cause was necessarily
external."); see also City of Burlington v. Indemnity Ins. Co. of N. Am., 332 F.3d 38,
47-48 (2nd Cir. 2003) (comparing this line of authority with more recent line of
authority applying more subjective interpretation of fortuity, which considers whether
parties knew of or expected loss); 10A Couch on Ins. § 148:59 (3d ed.) (entitled
"External Cause Requirement in All-Risk Insurance"). Regardless of how different
courts might interpret fortuity, the Rental Agreement's use of the term "external" in
conjunction with "all-perils insurance" clearly meant a policy that provided coverage
only for those losses with "external" causes. 

 This is what EnerVest procured: an all-risks policy, insuring "[a]ll risks of
physical loss or damages from any cause . . . except as hereinafter excluded," with a
fairly standard exclusion:

 Notwithstanding anything contained herein to the contrary, this
certificate does not insure:



 a. the cost of repairing or correcting wear and tear, metal fatigue,
mechanical or electrical breakdown or failure, inherent vice,
latent defect, gradual deterioration, corrosion, rust, dampness of
atmosphere, freezing or extremes of temperature or expansion or
contraction due to changes in temperature, but the foregoing shall
not be deemed to exclude any other loss, damage or expense
caused by or resulting from any of the aforesaid conditions;


 . . . .


(Emphasis added.) See Hecker & Goode, passim (discussing judicial interpretation
of standard all-risks exclusions, including inherent vice, latent defect, and wear and
tear). This policy had coverage dates on October 1, 2003 to October 1, 2004, and a
"revised property . . . schedule" produced with it listed the WPS Garden Island Bay
facility compressor. Also in evidence was the corresponding certificate of insurance,
naming WPS as the certificate holder, which (1) gave WPS additional insured status
"on all policies where and to the extent required by written contract"; (2) specifically
listed the WPS compressor at the Garden Island Bay facility; and (3) showed a date
of February 18, 2004, predating the fire. The trial court did not err in concluding that
this policy was what the Rental Agreement required.

 We address briefly further arguments that WPS asserts under this issue. First,
WPS contends that the Rental Agreement "required insurance [that] would have
covered all risks, irrespective of cause[,] if same were a fortuitous event";
accordingly, because the needle valve's breakage and resulting fire "were not
anticipated by either [party] and [were] thus a fortuitous event," the loss "would have
been covered by an all-risk policy[,] and as a result, EnerVest is responsible for the
cost of repairs, irrespective of the jury's finding [in Jury Question No. 1]." This
argument goes to whether the loss was covered under the policy that EnerVest
procured, not whether EnerVest procured the type of policy that the Rental
Agreement required. The trial court never tried the issue of coverage because that
issue was pending in a Louisiana lawsuit brought by WPS. How the Louisiana court
will interpret this all-risks policy's standard exclusionary language is irrelevant. 

 Second, WPS argues that EnerVest's breach "should relieve WPS, as a matter
of law[,] from the payment of damages to EnerVest and attorney's fees." We have
already held that the trial court correctly determined that EnerVerst did not breach the
Rental Agreement's insurance provision, and in any event, WPS provides no
authority or analysis to support this issue. See Tex. R. App. P. 38.1(i); Howeth Invs.,
Inc., 259 S.W.3d at 902. 

 Third and alternatively, WPS argues that "there are insufficient findings by the
jury to determine if there would be coverage under the required policy." This is not
surprising because (1) the parties submitted to the court the issue of whether EnerVest
breached the requirement to procure insurance and (2) the court did not determine
coverage. 

 Fourth, WPS contends that the policy's having a $50,000 deductible, which
was not shown in the certificate that WPS received, breached the requirement that the
"coverage value" be acceptable to WPS. However, "coverage value" is not the same
as "deductible"; the Rental Agreement was silent regarding a deductible. 

 Fifth, WPS contends that other policy exclusions breached the Rental
Agreement because they excluded coverage for loss or damage to "internal
combustion engines" and "mechanical or electrical breakdown or failure" "unless
caused by or resulting from external explosion and/or fire." WPS's argument is that,
if the trial court's "ruling that the insurance meets the contract provisions is allowed
to stand, WPS will be faced with the defense from the insurance company that the
above listed exclusions apply with no recourse. . . . To hold otherwise allows
EnerVest to assert exclusions which deny coverage without any risk or consequence." 
However, the trial court did not decide coverage or whether these exclusions actually
applied; additionally, we have interpreted the Rental Agreement to require all-risk
insurance for fortuitous events arising from external causes, and these provisions are
not inconsistent with that requirement--whatever their application is ultimately
determined to be. 

 Sixth and finally, WPS argues that a number on a property schedule associated
with the WPS compressor, as well as the schedule's printing date, indicate that
"EnerVest did not have coverage until after the fire," specifically, that these notations
indicate that the policy was not effective at the time of the fire because the premium
was prorated. Suffice it to say that the evidence in this regard is disputed and is not
as clear as WPS contends; in any event, the cited evidence does not render the trial
court's findings against the great weight and preponderance of the evidence.

 We overrule WPS's issue E.

Conflict in Jury Questions Nos. 1 and 3


 Under its issue "F," WPS contends that Jury Questions Nos. 1 and 3 are
"inconsistent and require reversal" because, for the former, the jury allegedly had to
find that EnerVest properly used the compressor (WPS's breach-of-implied-warranty-of-merchantability argument), and for the latter, the jury had to find implicitly that
EnerVest's improper use of the compressor caused its down time. (9)

 WPS waived this complaint by having failed to raise it before the jury was
discharged. See Oyster Creek Fin. Corp. v. Richwood Inv. II, Inc., 176 S.W.3d 307,
324 (Tex. App.--Houston [1st Dist.] 2004, pet. denied) ("It is well-settled that, to
preserve error, an objection to conflicting jury findings must be made before the jury
is discharged."). In any event, the basis for this challenge is faulty because it assumes
that Jury Question No. 1 presented, and EnerVest pursued, a breach-of-implied-warranty-of-merchantability claim, so that the question should have included an
instruction that EnerVest properly used the compressor after delivery. As discussed
above, the trial court did not abuse its discretion in refusing WPS's proffered
instruction on proper use. Without this instruction, the answers are not necessarily
inconsistent. 

 We overrule WPS's issue F.

Legal- and Factual-Sufficiency Challenges to Damages and Attorney's Fees


 Under its issue "H," WPS complains that there is legally and factually
insufficient evidence of (1) actual damages and (2) attorney's fees.

A. Actual Damages

 WPS does not explain where it preserved its challenges to actual damages, and
we have not found them in its charge objections or its motions for directed verdict,
JNOV, or new trial. See Tex. R. App. P. 33.1(a)(1). In any event, they are without
merit. The charge allowed the jury to consider, as elements of actual damages,
EnerVest's expenses in installing the WPS compressor and its expenses in removing
it after the fire. The jury awarded $176,186 in actual damages. One of EnerVest's
vice presidents, Barbara King, testified without objection that the former expense was
$150,475 and that the latter expense was $60,496. WPS contends that King had no
personal knowledge of the costs or expenses, but the record that WPS cites in support
does not say this and, again, WPS never objected to her testimony. WPS also
complains that no invoices, checks, or "other records" supporting the accounting
summary were allegedly introduced. However, during King's testimony, EnerVest
introduced Plaintiff's Exhibit 73--a printed "readout" from its accounting department
indicating EnerVest's actual costs of installation and replacement, from which King
testified--to which WPS advised the trial court that it had "no objection." In any
event, WPS cites no authority saying that failure to introduce such documentation
renders testimony based on it incompetent, rather than making it a credibility
determination for the jury to decide. 

B. Attorney's Fees

 WPS did not need to preserve its legal- and factual-sufficiency challenges to
the evidence supporting attorney's fees because the issue was tried to the court. See
Tex. R. App. P. 33.1(d). But to the extent that WPS argues that EnerVest's counsel
did not segregate his fees, WPS did not raise this objection below and has waived it. 
See Tex. R. App. P. 33.1(a)(1). 

 WPS contends that EnerVest's counsel's testimony of his and his associate's
fees was "unsupported," but it was not: the underlying bills were admitted into
evidence. He also testified, without objection, about his experience and that his fees
were reasonable and necessary. He further testified without objection that the total
amount through trial was $288,560.71 and opined that fees for an appeal would be
$25,000, for a petition of review in the Texas Supreme Court would be $10,000, for
briefing there would be $15,000, and for oral argument there would be $5,000. The
trial court awarded $260,000, $25,000, $10,000, $15,000, and $5,000, respectively. 
There was ample evidence to support the award of fees.

 We overrule issue H in its entirety.

Jury Misconduct


 Under its issue "I," WPS argues that the trial court erred in overruling its
motion for new trial on the basis of juror misconduct. In support, WPS submitted the
affidavits of two jurors, who averred that (1) the jury effected a compromise verdict,
so as not to have to return the following week to continue deliberations, and (2) the
jury believed that it was answering the charge in such a way that neither party would
recover. The trial court struck the affidavits and denied the motion.

 The affidavits were patently inadmissible. See Tex. R. Civ. P. 327(b) ("A juror
may not testify as to any matter or statement occurring during the course of the jury's
deliberations or to the effect of anything upon his or any other juror's mind or
emotions as influencing him to assent to or dissent from the verdict concerning his
mental processes in connection therewith, except that a juror may testify whether any
outside influence was improperly brought to bear upon any juror. Nor may his
affidavit or evidence of any statement by him concerning a matter about which he
would be precluded from testifying be received for these purposes."); Tex. R. Evid.
606(b) ("Upon an inquiry into the validity of a verdict . . . , a juror may not testify as
to any matter or statement occurring during the jury's deliberations, or to the effect
of anything on any juror's mind or emotions or mental processes, as influencing any
juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit
or any statement by a juror concerning any matter about which the juror would be
precluded from testifying be admitted in evidence for any of these purposes.
However, a juror may testify: (1) whether any outside influence was improperly
brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified
to serve."). Without the affidavits, WPS had no evidence to support this new-trial
ground.

 WPS implicitly acknowledges in its brief that the affidavits were inadmissible. 
And although WPS states in passing that the rules precluding consideration of such
evidence are "unduly broad and may, under certain circumstances . . . [deny] litigants
due process of law," WPS never briefs any constitutional challenge to the
exclusionary rule. The principal authority that it cites comes from Florida, and the
relevant statute discussed in those cases differs materially from the Texas rules.

 We hold that the trial court did not abuse its discretion in striking the affidavits
and overruling this challenge in WPS's motion for new trial. We overrule WPS's
issue I.

Modification of Summary-Judgment Ruling


 WPS's entire argument under its issue "J" (mislettered as issue "H") is:

 The order of the Trial Court granting a partial summary judgment
provided in pertinent part: "THE COURT FINDS AND RULES AND
ORDERS [EnerVest] is obligated to provide insurance to cover the loss
in question." . . . The trial court did not incorporate this finding into it
[sic] findings of fact and conclusions of law and advised the parties that
she had misspoken and did not intend to rule as set forth in the Order
granting the Motion for Summary Judgment but only intended to hold
that Enervest was required to provide insurance as required by contract. 
This error by the Trial court requires a reversal of the judgment entered.


 WPS does not explain where it preserved this challenge, and it did not object
when the trial court verbally altered its summary-judgment ruling at the start of trial. 
See Tex. R. App. P. 33.1(a)(1). In any event, WPS's challenge contains absolutely no
analysis or citation to authority. It is thus inadequately briefed, and we overrule it for
this reason, as well. See Tex. R. App. P. 38.1(i); Howeth Invs., Inc., 259 S.W.3d at
902.

Conclusion


 We affirm the judgment of the trial court.


 Tim Taft (10)

 Justice


Panel consists of Justices Keyes, Alcala, and Taft.
1. The breach-of-express-warranty claim under the MSC was not submitted to the jury.
2. The parties' post-judgment motions and responses and the trial court's rulings on
WPS's request for amended findings of fact and conclusions of law reflect this same
understanding. For example, WPS's motions for JNOV and new trial admitted that
EnerVest "has not sued for breaches of alleged implied warranties of any type";
argued that "[i]f EnerVest did not prove its allegation that the valve . . . was defective,
it cannot prevail on its alleged breach of contract claim"; and advised that "[w]hile
there has been no allegation of breach of an implied warranty, the analysis [of having
to prove defect at time of delivery] is still persuasive." It was not until its later
request for amended findings of fact and conclusions of law that WPS first asserted
that EnerVest's claim for breach of the Rental Agreement must have been tried to the
court, rather than to the jury, because Jury Question No. 1 was not "a finding of an
alleged 'breach'" by WPS: WPS thus requested findings on the missing breach-of-contract elements and a conclusion of law that the "trial court's conclusion that there
was an actionable breach of the Rental Agreement is based on the jury's answer to
Question No. 1 . . . ." See Tex. R. Civ. P. 299. The trial court rejected WPS's former
request as "subject of the jury trial" and its latter request as "not subject to conclusion
of law," again indicating that the trial court understood that its charge presented a
breach-of-contract claim to the jury.
3. The proposed questions and instructions were:


 a. "Was the cause of the . . . fire internal to the Compressor package as
furnished by WPS or to one of its components furnished by WPS?"

 b. "Was the cause of the . . . fire the result of a deficiency or defect
internal to the Compressor package as furnished by WPS or to one of
its components furnished by WPS?"

 c. "You are instructed that a deficiency or defect internal to the
Compressor package as furnished by WPS or to one of its components
furnished by WPS includes, but is not limited to, wear and tear, metal
fatigue, mechanical or electrical breakdown or failure, inherent vice,
latent defect, gradual deterioration, corrosion, rust, or dampness of
atmosphere." (The instruction was apparently offered in conjunction
with proposed question b., above, and tracked exclusionary language
in the policy that EnerVest had purchased.)
4. Although Jury Question No. 1 did not follow the usual broad-form submission for a
contract's breach (see Tex. Pattern Jury Charge Contracts 101.2), WPS does not
complain in its opening brief on appeal that the jury's answer to this question (1)
cannot support judgment on EnerVest's breach-of-contract claim for this reason; (2)
failed to present all breach-of-contract elements that were contested; (3) was
erroneous for not having been in broad form generally; or (4) could not support
judgment because the question was not necessarily referable to a breach-of-contract
claim, resulting in that claim's waiver. In a few sentences of its reply brief, WPS
asserts without citation to authority that "in the absence of EnerVest pointing out any
other contractual obligations which were breached the only logical conclusion is that
the failure of the needle valve was, depending upon the cause, a breach of the implied
warranty of fitness," so that "this was in fact, at least in part, a suit for breach of the
implied warranty of fitness"; also, new appellate counsel for WPS filed a post-argument response that briefly raised some of the arguments noted above. However,
we will not consider new issues raised in such belated briefing. Additionally, at trial,
WPS did not (1) object that the question omitted essential elements or seek findings
of fact on same before judgment (see Tex. R. Civ. P. 279) or (2) raise any of the
above complaints in its motions for JNOV or new trial.
5. In any event, as discussed further below, there was legally and factually sufficient
evidence that the defect found by the jury was inherent in the valve and that the
valve's break did not result from vibration caused by EnerVest's allegedly improper
installation.
6. Gary Killingsworth, WPS's operations manager
, testified that although WPS's lead
field technician, James Courville, had "questioned" the installation, he "didn't make
a noise about it" and indicated to Killingsworth that "the unit ran smooth" when
questioned about vibration. Killingsworth testified that Courville "should have called
me and I should have gotten more involved in it." WPS's president, Seth
Williamson, concurred that if WPS's mechanic believed that there was an installation
problem, he should have told Killingsworth. Courville confirmed that he believed that
the skids' not being mounted, and the cooler's overhanging the structure, were
improper, but could not recall having told anyone about this deficiency, nor was he
concerned enough to have told anyone at WPS.
7. To the extent that vibration could have caused the valve to break (WPS's theory),
there was evidence that the lower part of the WPS compressor's skids were not filled
with concrete, whereas skids of that size usually were concrete-filled. Killingsworth
indicated that WPS's general procedure was to fill the pedestals with concrete "to
increase the mass under the engine and compressor to . . . absorb the frequencies of
the engine and compressor." It was WPS that designed or put together the
"compressor package; engine, compressor, and . . . the skid."
8. WPS describes these as factual-sufficiency challenges to the trial court's findings, but
they are instead purely legal arguments.
9. Jury Question No. 3 asked whether WPS's compressor package failed to meet the
95% uptime guarantee and instructed that one exception to WPS's accountability for
the compressor's down time would be for various acts of EnerVest, including any
error of Enervest's resulting in operating conditions outside normal parameters. The
jury answered, "No."
10. The Honorable Tim Taft, who retired from the First Court of Appeals effective June
1, 2009, continues to sit by assignment for the disposition of this case, which was
submitted on December 16, 2008.