### SMI REALTY MANAGEMENT CORPORATION, Appellant,

v.

### UNDERWRITERS AT LLOYD'S, LONDON, Appellee.

No. 01–03–01340–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 31, 2005.

Rehearing Overruled Nov. 29, 2005.

David George, Edwards, Burns & Braziel, LLP, Houston, for appellant.

Vance Christopher, Christopher A. Prine, Crain, Caton & James, P.C., Houston, for appellee.

Panel consists of Chief Justice RADACK and Justices HANKS and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

In this insurance-coverage dispute, SMI Realty Management Corporation ("SMI") appeals the trial court's summary judgment in favor of Underwriters at Lloyd's, London ("Underwriters"). We determine whether the term "Leakage," found in an exclusionary provision of an "all-risks" policy, is ambiguous or whether, as a matter of law, it serves to deny SMI coverage in this case.

We reverse and remand.

### Factual and Procedural Background

SMI contracted with Underwriters for first-party property insurance, covering the period of January 9, 1999 to January 9, 2000. The "all-risks" policy provided coverage for the Rutledge Apartments, an apartment complex managed by SMI. In September 1999, SMI discovered foundation damage at the complex. SMI filed a property loss notice with Underwriters's agent, attributing the foundation damage to "a plumbing leak underground."

Underwriters ultimately refused to pay the claim under the policy. SMI filed suit on December 9, 2002, alleging that "the foundation damage to the apartments was caused by a sewer pipe leak, which is covered under the [policy]." SMI based its claims against Underwriters on violations of Texas Insurance Code articles 21.21 and 21.55, breach of Underwriters's duty of good faith and fair dealing, and breach of contract.

During the discovery process, SMI produced a copy of a report to Underwriters, prepared by David Grissom, a licensed professional engineer. The March 6, 2001 report stated that Grissom had inspected and surveyed the subject apartment building that was experiencing foundation damage. In his report, Grissom noted that the building was built in 1963 and has a "cast iron sewage system." He explained that "[t]he corrosive nature of the clay soil in the area has been known the [sic] deteriorate cast iron pipe to the point of leaking in less than 20 years." With regard to the subject building, he advised as follows:

> The whole system appears to be leaking due to age and deterioration and very likely needs to be completely replaced. You would be ill advised to just replace the sewer system on the areas of the known leaks. All the case iron sewer should be replaced. The foundation motion now evident is what one would expect if the sewer has been discharging water under the slab for almost 20 years.

Grissom concluded, "It is my opinion that sewer leaks are responsible for the repairs now needed on this foundation." In a supplemental report dated May 31, 2002, Grissom reiterated that, in his professional opinion, the sewer lines at the apartment complex were leaking due to deterioration and age. He opined that "[i]t is clear that leaks in the badly corroded sewer system have caused the foundation motion" and "[i]t seems clear that sewer leaks are responsible for the repairs now needed on this foundation."

Underwriters filed a motion for summary judgment, contending that SMI's claim was not covered because the policy expressly excludes loss or damage caused, directly or indirectly, by deterioration, corrosion, or leakage. In addition to the policy and SMI's notice of property loss, Underwriters offered Grissom's report and supplemental report as summary judgment evidence. Referring to Grissom as "plaintiff's expert," Underwriters pointed out that Grissom's reports, taken as true, showed that the claimed loss was caused by deterioration, corrosion, and leakage; thus, the claim was properly excluded and Underwriters was entitled to judgment as a matter of law.

In its response, SMI contended that the exclusion relied on by Underwriters, and in particular the term "Leakage," found in the exclusion, is ambiguous. SMI asserted that the exclusion could be reasonably read to exclude only losses that occur gradually, over time. SMI reasoned, "Thus, it is reasonable to assume that Lloyds did not intend to exclude damages that occurred in a relatively short period of time, but rather only damages that occurred gradually."

SMI contended that Grissom's reports were not competent summary judgment evidence because Grissom was not SMI's "designated" expert.[1] SMI offered the report of Ralph Adams, a professional engineer, who SMI had expressly designated as its expert. In his report, Adams disagreed with Grissom's opinion regarding the cause of the sewer line leaks. Although he stated that the cause of the sewer pipe leaks was not known, Adams doubted that the leakage was caused by corrosion, as concluded by Grissom. Adams opined that the damage to the foundation occurred as a result of a broken sewer line "in a relatively short period of time." Based on Adams's opinion and its reading of the exclusion, SMI asserted that a genuine issue of material fact existed as to whether SMI's loss fell within the exclusion cited by Underwriters.

Underwriters filed a reply in which it contended, *inter alia*, that the term "Leakage" found in the applicable exclusion was not ambiguous. Following a hearing, the trial court signed an order granting Underwriters's motion for summary judgment and ordered that SMI take nothing by its claims against Underwriters.

### Standard of Review

The well-settled principles governing the review of summary judgments apply in insurance coverage cases. *Hanson v. Republic Ins. Co.*, 5 S.W.3d 324, 327 (Tex. App.-Houston [1st Dist.] 1999, pet. denied). That is, the issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *S.W. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.

---

1. The trial court overruled SMI's objection to the Grissom reports, and SMI does not challenge that ruling on appeal.

2002). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). When an order granting summary judgment does not specify the grounds on which it was granted, as here, we will affirm the judgment if any of the movant's theories are supported by the evidence. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

**The Policy Provisions and Contentions of the Parties**

■ In this "all-risks" policy, the relevant provisions are as follows:

5. *PERILS INSURED AGAINST*

This Certificate insures against All Risks of Direct Physical Loss or Damage to covered property occurring during the period of this Certificate.

6. *PERILS EXCLUDED*

This Certificate does not insure against loss or damage caused directly or indirectly by any of the following, whether the loss or damage was caused in whole or in part by the excluded peril and whether any other peril contributed to such loss or damage.

1. Wear, tear or gradual deterioration; Wet rot, dry rot or mould; Spoilage, decay or decomposition; Normal settling, shrinking or expansion in buildings; [sic] structures or foundations; Corrosion or rust; Erosion; Leakage; *any other gradually occurring loss;* or any loss which commenced prior to the inception of this Certificate.

(Emphasis added.)

Underwriters contends that SMI's claimed loss is not covered under the poli-

cy based on the above exclusion, under either Grissom's or Adams's report. Both experts opined that the foundation damage was caused by a sewer leak. The experts' opinions can be characterized as differing in that Grissom believed that the damage was caused by sewer leaks that were gradual, occurring over a long period of time, while Adams believed that the sewer leaks were caused by broken pipes, occurring over a short period of time.

"Leakage" is not defined in the policy and each party offers its own definition. Underwriters reads the exclusionary term to mean any type of leakage, regardless of whether it occurred rapidly or gradually. SMI counters that the term can be reasonably read to exclude only gradually occurring leaks.

■ SMI relies on the doctrine of *contra proferentem,* or construing a contract term against the insurer in favor of coverage. This doctrine, however, is employed only when construing an ambiguous policy provision. *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676–77 (Tex.App.-Austin 2003, no pet.); *see also State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995) (explaining that only if insurance policy remains ambiguous after courts apply canons of interpretation should policy's language be construed against insurer in manner that favors coverage). Thus, if the policy is subject to more than one reasonable interpretation, we must adopt the construction most favorable to the insured when we resolve the uncertainty. *State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex.1998). An ambiguity does not arise with respect to a policy merely because the parties advance conflicting interpretations. *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455,

458 (Tex.1997). Whether a policy provision is ambiguous is a question of law for the court to decide. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998).

■■ In making this determination, we interpret insurance policies according to the rules of contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). Our primary goal, therefore, is to give effect to the written expression of the parties' intent. *Beaston,* 907 S.W.2d at 433. To this end, we construe the terms of the contract as a whole and consider all of its terms, not in isolation, but within the context of the contract. *Id.; Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133–34 (Tex.1994); *Hartrick v. Great Am. Lloyds Ins. Co.,* 62 S.W.3d 270, 274 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

■ If a contract can be given only one reasonable meaning, it is not ambiguous and will be enforced as written. *See Kelley–Coppedge,* 980 S.W.2d at 464. On the other hand, if a contract is susceptible to two or more reasonable interpretations, it is ambiguous. *Id.* When an alleged contract ambiguity involves an exclusionary provision of an insurance policy, then we " 'must adopt the construction ... urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.' " *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex. 1991)). The insurer has the burden of proving that a policy limitation or exclusion constitutes an avoidance or an affirmative defense. *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.,* 141 S.W.3d 198, 204 (Tex.2004). With these principles in

mind, we turn to the crucial question in this case: Is SMI's interpretation of the term "Leakage" in the exclusion reasonable?

The parties have not directed us to any cases interpreting this precise exclusionary provision and our own research has found none. SMI asserts that the last phrase of the exclusion, "any other gradually occurring loss," indicates that only gradually occurring leaks are excluded from coverage. According to SMI, the use of the word "other" signals that the contracting parties (SMI and Underwriters) viewed the perils listed before that phrase, including "Leakage," to also be gradually occurring losses. SMI contends that, at a minimum, the phrase refers to the immediately preceding term listed in the exclusion: "Leakage."

In essence, SMI is offering the reverse of the interpretive canon of *ejusdem generis.* The rule of *ejusdem generis* provides that, when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation. *Hilco Elec. Coop., Inc. v. Midlothian Butane Gas Co.,* 111 S.W.3d 75, 81 (Tex. 2003). The "reverse *ejusdem generis*" principle has been applied by courts to allow a broader category to define the scope of a more specific example. *See Dong v. Smithsonian Inst.,* 125 F.3d 877, 879–80 (D.C.Cir.1997) (applying reverse *ejusdem generis* to conclude that, when federal statute, 42 U.S.C. section 552(f), defines agency as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch," first four, specific classes are limited to "establishments in the executive branch"); *Bristol–Myers Squibb Co. v. United States,* 48 Fed.Cl. 350, 358 (2000)

(applying reverse *ejusdem generis* to construe contractual provision). The courts have reasoned that " 'the phrase 'A, B, or any other C' indicates that A is a subset of C.' " *Dong*, 125 F.3d at 880 (quoting *United States v. Williams–Davis*, 90 F.3d 490, 508–09 (D.C.Cir.1996)); *see also Cochran, Fox & Co., Inc. v. Public Serv. Comm'n*, No. 98–1765, 1999 WL 624395, at *3 (Wis. Ct.App. Aug. 18, 1999) (concluding that, when statute defines "transmission equipment and property" as "any conduit, subway, pole, tower, transmission wire or other equipment on, over or under any street or highway," the phrase "on, over or under any street or highway" further restricts meaning of specific terms to types of structural transmission equipment along or under public rights of way); *United States v. Delgado*, 4 F.3d 780, 786 (9th Cir.1993) (providing example that "a stat-

ute regulating fishing may state that licensed individuals may catch ... 'bass, trout, or any other fresh water fish.' The limits would apply to fresh water bass, such as black bass, but not to sea bass, because the clause 'or any other fresh water fish' limits 'bass' and 'trout' to those in fresh water.").[2] Similarly, SMI contends that the policy excludes only gradually occurring leakage, but not sudden leakage, because the phrase "any other gradually occurring loss" limits the scope of "Leakage" to that which is gradually occurring. That is, "Leakage" is modified by, and a subset of, "any other gradually occurring loss." We conclude that such a reading of the term "Leakage" is reasonable.

Not surprisingly, Underwriters disagrees that the phrase "any other gradually occurring loss" serves to limit the mean-

---

**2.** To ascertain the meaning and scope of "Leakage," the parties implicitly argue the related maxim of *noscitur a sociis*—that a word is known by the company it keeps. *Noscitur a sociis* is a rule often applied so that the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it. *Farmers' & Mechanics' Nat'l Bank v. Hanks*, 104 Tex. 320, 137 S.W. 1120, 1124 (1911); *see County of Harris v. Eaton*, 573 S.W.2d 177, 181 (Tex. 1978) (Steakley, J., dissenting) (discussing *noscitur a sociis* in context of statutory construction: "the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute, and that where two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other"). In this regard, we look to the other terms listed in the exclusionary clause to determine whether those conditions are generally considered to be gradually occurring or rapidly occurring. We note that courts have held that other perils listed in the exclusion at issue here are not subject to any type of temporal limitation. For example, at least one court has held that two other perils listed in the exclusion, "corrosion and rust," are

not limited to gradually occurring corrosion or rust; rather, all corrosion and rust are excluded from coverage regardless of whether it is fast or gradual-forming in nature. *Gilbane Bldg. Co. v. The Altman Co.*, No. 04AP–664, 2005 WL 534906, at *5 (Ohio Ct.App. 10th Dist. Mar. 8, 2005); *see Arkwright–Boston Mfrs. v. Wausau Paper Mills Co.*, 818 F.2d 591, 595 (7th Cir.1987) (concluding that rate at which corrosion occurred "not relevant to whether it falls under the corrosion exclusion"). Similarly, another court has held that the rate of "contamination"—another peril listed in the exclusion—was not determinative of whether the exclusion applied; rather, the exclusion applied to both fast and slow contamination. *Richland Valley Prods., Inc. v. St. Paul Fire & Cas. Co.*, 201 Wis.2d 161, 548 N.W.2d 127, 132 (Ct.App.1996). *But see Largent v. State Farm Fire & Cas. Co.*, 116 Or. App. 595, 842 P.2d 445, 446 (1992) (holding that "contamination exclusion" applied only when contamination happens over time). However, these cases are distinguishable from the instant one because they do not involve exclusions that include the modifying phrase "any other gradually occurring loses." Thus, the rule of *noscitur a sociis* is not determinative of the meaning of "Leakage" in this case.

ing of "Leakage." It contends that all leakage, and not only gradually occurring leakage, is excluded from coverage because the term "Leakage" and the phrase "any other gradually occurring loss" are separated by a semicolon. In its brief, Underwriters avers, "[T]he semi-colon establishes that the two phrases have independent significance, and denotes that they do not depend on each other for meaning but instead should be read independently." Underwriters asserts that "Leakage" is "an independent phrase not modified by those that precede or follow it." Underwriters further contends that "[t]he fact that 'Leakage' is capitalized only adds to this conclusion." As highlighted by the dissenting opinion, Underwriters's reading of the exclusion is *one* reasonable interpretation. However, it is not the *only* reasonable interpretation and does not serve to make SMI's reading of the disputed language unreasonable. *See Balandran,* 972 S.W.2d at 741.

To support its position that its reading of the exclusion is definitive, Underwriters cites *Criswell v. European Crossroads Shopping Center, Ltd.,* 792 S.W.2d 945 (Tex.1990). In that case, the Texas Supreme Court noted that, although *words contained in an instrument should be used as controlling guides,* punctuation marks can *aid* in the construction of a document. *Id.* at 948. In interpreting a contractual provision, the court determined the effect of a semicolon that separated two phrases in the contract. *Id.* Based on the specific facts of that case, the *Criswell* court concluded that the use of semicolons by the drafter "indicated that each phrase set off by a semicolon was to be read as having independent significance." *Id.*

Here, each peril listed in the exclusion also has "independent significance"; that is, a loss caused by any one of the enumer-ated perils is excluded. As in *Criswell,* the semicolons in the exclusion appear to denote the word "or." *Id.* However, unlike those in *Criswell,* the phrases at issue here are not completely self-referential. Rather, the final phrase of the exclusion—"any other gradually occurring loss"—can be reasonably construed to both lend meaning to, and derive meaning from, the terms that precede it. Moreover, SMI is not seeking to rely on one clause to effectively nullify another; instead, SMI promotes a reading that harmonizes the terms of the exclusion.

Underwriters also contends that to accept SMI's interpretation of "Leakage" would be to read the term out of the contract and render it superfluous. Underwriters asserts, "To accept SMI's argument and construe the exclusion for 'Leakage' to mean only damage caused by leakage 'occurring gradually' would be superfluous, because the loss would be excluded simply by the phrase 'any other gradually occurring loss.'" We disagree with Underwriters's reasoning.

The relevant phrases of the policy exclusion can be read to avoid superfluities. The exclusion lists numerous, specific perils that are excluded, including "Leakage." The exclusion also contains the catch-all phrase "any other gradually occurring loss," which strives to exclude from coverage any gradually occurring losses not previously encompassed within the exclusion. In other words, the "any other gradually occurring loss" phrase can be reasonably read to indicate that the terms preceding it in the paragraph are not exhaustive. Construed in this manner, neither "Leakage" nor "any other gradually occurring loss" is rendered superfluous. That the latter catch-all phrase can also be read to limit the scope of "Leakage" does not render "Leakage" useless as an exclusionary term.

Underwriters also contends that the "specific 'Leakage' provision" governs over the "more general 'any other gradually occurring loss' provision." In this regard, Underwriters relies on the well-established maxim that when there is a conflict between two contract provisions, the specific provision controls over the general provision. *See C.M. Asfahl Agency v. Tensor, Inc.,* 135 S.W.3d 768, 782 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *Ostrowski v. Ivanhoe Prop. Owners Improvement Ass'n, Inc.,* 38 S.W.3d 248, 254 (Tex.App.-Texarkana 2001, pet. denied). However, no "conflict" exists between the term "Leakage" and the phrase "any other gradually occurring loss." Rather, the provisions are harmonized under SMI's reading of the provision. "Any other gradually occurring loss" serves to further define "Leakage" and also operates as a catch-all phrase to exclude additional, gradually occurring losses not specifically contemplated in the exclusion.

Moreover, this is not a matter of whether a general term controls over a specific one; rather, it is a matter of whether, when read contextually, one phrase can reasonably be read as qualifying or limiting another. It is also noteworthy that Underwriters's reading arguably renders "Leakage" the more general term. Underwriters interprets "Leakage" to denote all types of leaks, while SMI views "any other gradually occurring loss" as limiting the types of perils excluded to those that are gradually occurring. In any event, we conclude that the phraseology at issue does not fit the "specific controls the general" rubric of contract interpretation.

Underwriters further points out that the first portion of the exclusion provides that damage caused by "Wear, tear or *gradual* deterioration" are not covered. (Emphasis added.) Underwriters contends that, because it chose to modify the term "deterioration" with the word "gradual," the lack of such modification before the term "Leakage" shows a clear intent not to limit leakage to leaks that are gradually occurring. It is noteworthy that "gradual deterioration" is among the first perils listed in the exclusion, while "Leakage" is the last, juxtaposed directly next to the phrase "any other gradually occurring loss." Underwriters's contention would find more support if "gradual deterioration" had been placed toward the end of the exclusion, near the phrase "any other gradually occurring loss."

▮▮▮ In sum, though Underwriters interpretation of the term "Leakage" is reasonable, it does not render SMI's reading unreasonable. To the contrary, we conclude that SMI's reading that "Leakage" is limited to gradually occurring leakage is not an unreasonable interpretation in light of the word choice and syntax utilized by Underwriters in drafting the exclusionary provision.[3] Thus, the exclu-

---

**3.** SMI's reading appears even more reasonable when it is remembered that this is an all-risks policy. *Cf. Balandran,* 972 S.W.2d at 741 (explaining that insured's reading of policy exclusion became "even more reasonable" when considering circumstances surrounding promulgation of policy form by committee appointed by former state Board of Insurance). As a general rule, an all-risks policy creates a special type of coverage in which the insurer undertakes the risk for all losses of a fortuitous nature that, in the absence of the insured's fraud or other intentional miscon-

duct, is not expressly excluded in the agreement. *Miles v. Royal Indem. Co.,* 589 S.W.2d 725, 729 (Tex.Civ.App.-Corpus Christi 1979, writ ref'd n.r.e.); *Muniz v. State Farm Lloyds,* 974 S.W.2d 229, 234 (Tex.App.-San Antonio 1998, no writ); *see also* Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 148:50 (3d ed. 1998). In discussing the historical genesis of the "fortuity doctrine," one oft-cited journal article explains, "If risk is central to insurance, then certainty is antithetical to it. The requirement that any loss be accidental in

sionary provision in the policy, in particular the term "Leakage," is ambiguous. *See Balandran,* 972 S.W.2d at 741. Because SMI is the insured, we must adopt their interpretation as the proper construction of the policy. *See id.* at 742. By offering the expert opinion of Adams that the damage to the foundation had occurred as a result of a broken sewer line "in a relatively short period of time," SMI created a genuine issue of material fact regarding coverage.[4] We hold that the trial court did not properly grant summary judgment in this case.

We sustain SMI's sole issue.

## Conclusion

We reverse the judgment of the trial court and remand the cause for further proceedings.

Chief Justice RADACK dissenting.

SHERRY RADACK, Chief Justice, dissenting.

Because I believe that the policy unambiguously excludes coverage for all "leakage," both sudden and gradually occurring, I respectfully dissent. In *Criswell v. European Crossroads Shopping Center, Ltd.,* 792 S.W.2d 945, 948 (Tex.1990), the supreme court stated that use of semicolons in drafting an agreement indicates that each phrase set off by a semicolon is to be read as having independent significance. In this case, the items in the list of excluded perils are set apart by semi-colons. Therefore, I believe that each has independent significance, and one item cannot be used to modify another. As such, the policy provides that it excludes "leakage" and "any other gradually occurring loss." I cannot read the policy to exclude only "gradually occurring leakage," as the term "leakage" is not so modified in the policy. *See County of Maverick v. Tex. Ass'n of Counties Workers' Comp. Self–Ins. Fund,*

---

some sense in order to be compensable is implicit in the very nature of insurance." Stephen A. Cozen & Richard C. Bennett, *Fortuity: The Unnamed Exclusion,* 20 FORUM 222, 222 (1985). Arguably, SMI's reading of the exclusionary language to limit "Leakage" to gradually occurring leaks is consistent with the overall purpose of all-risk policies to limit coverage to fortuitous events. That is, it seems intuitive that gradual leaks are more likely to involve non-fortuitous events, while sudden, rapidly occurring leaks are more likely to involve fortuitous ones. However, as the Fifth Circuit remarked in *Aetna Cas. & Sur. Co. v. Yates,* "[t]he description of the policy as 'All Risks' is rather a misnomer since it contains fourteen lettered exclusions...." 344 F.2d 939, 940 (5th Cir.1965). Thus, it may be helpful to consider how courts have interpreted equivalent exclusionary provisions. In this regard, the Second Circuit, reading a similarly worded provision, concluded that, as a whole, the purpose of the exclusion was to remove from all-risk coverage those losses that are intrinsically caused, as opposed to those that are caused by external forces. *City of Burlington v. Indem. Ins. Co. of N. Am.,* 346

F.3d 70, 75 (2d Cir.2003); *see* Cozen & Bennett, *supra,* at 224 ("[A]n insurance policy is not a warranty of soundness, and the carrier's obligations do not extend to damage that is not occasioned by external or extraneous forces"). SMI's proffered definition of "Leakage" can be read to be consistent with such a reading of the exclusion.

4. Underwriters contends that SMI cannot create a fact issue by producing conflicting expert reports. Underwriters admits that it has found no authority to support this contention and we know of none. In any event, the record is not clear regarding the exact relationship of SMI and Grissom. Some indication exists in the record that SMI produced Grissom's reports to Underwriters during discovery, but we do not know the wording of the discovery request under which the reports were produced. It appears undisputed that SMI has designated Adams, not Grissom, as its expert for purposes of this litigation. Thus, assuming Grissom's opinion is admitted at trial, it will be for the fact-finder to determine which expert it chooses to believe.

852 S.W.2d 700, 705 (Tex.App.-San Antonio 1993, no writ) ("[If] one party's interpretation would require the insertion of a qualifying phrase, that interpretation must be rejected as violating the rule of giving language its ordinary meaning."). Accordingly, I dissent. I would affirm the summary judgment granted in favor of Underwriters.