DALLAS NATIONAL INSURANCE COMPANY, Appellant,

v.

SABIC AMERICAS, INC., Appellee.

No. 01–08–00758–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 10, 2011.

112

**114**

Diana L. Faust, R. Brent Cooper, Cooper & Scully, P.C., Ronda Blackwell, Dallas, TX, for Appellant.

Aaron Pool, Robert D. Brown, Donato, Minx & Brown, P.C., Houston, TX, James A. Riddle, Holland & Knight LLP, San Francisco, CA, for Appellee.

Panel consists of Justices JENNINGS, ALCALA, and SHARP.

## OPINION

JIM SHARP, Justice.

Seeking a determination of its rights and obligations under four commercial general-liability insurance policies it had issued to appellee Sabic Americas, Inc., appellant Dallas National Insurance Company filed a declaratory-judgment action. Sabic filed a counterclaim seeking, *inter alia,* a declaratory judgment that the four policies obligated Dallas National to defend and indemnify it in eight underlying lawsuits. With both parties' cross-motions for summary judgment before it, the trial court granted Sabic's motion and ordered Dallas National to reimburse Sabic for any defense costs it incurred as a result of the underlying lawsuits. On appeal, Dallas National contends that the trial court erred in declaring that it was obligated to defend and reimburse Sabic. We affirm.

## Background

Eight lawsuits were filed against Sabic—four in the Southern District of New York and four in the Middle District of Florida (underlying lawsuits).[1] The plaintiffs in each of the underlying lawsuits allege that they are municipal corporations supplying water to thousands of customers residing within their respective boundaries[2] and allege that their water supply systems and groundwater were contaminated by the methyl tertiary butyl ether (MTBE) that over fifty defendants, including Sabic, added to the petroleum products

---

1. All of the underlying lawsuits were consolidated into one multidistrict-litigation proceeding presently pending in the Southern District of New York. The Florida and New York suits raise virtually identical allegations.

2. The plaintiffs in the underlying lawsuits are: City of Greenlawn Water District; Albertson Water District; Town of Huntington/Dix Hills Water District; City of Glen Cove Water District; Homosassa Water District; Tampa Bay Water; The City of Inverness; and the City of Crystal River.

that they manufactured, refined, formulated, distributed, supplied, sold and/or marketed. The pleadings in the underlying lawsuits raise numerous causes of action, including negligence, product liability, deceptive business practices, and trespass. The plaintiffs in each of those lawsuits are seeking (1) removal of contaminants from the groundwater and soil, (2) testing and monitoring of their groundwater, and (3) recovery of damages for testing costs, remediation, or treatment costs, including damages to water wells, pumping stations, filters, and other property.

Although the pleadings in each of the underlying lawsuits raise specific allegations with regard to some of the individual defendants, none of them raises any specific allegations with respect to Sabic. Rather, the plaintiffs in the underlying lawsuits allege that the "defendants," including Sabic, began adding MTBE to the petroleum products that they manufactured, refined, formulated, distributed, supplied, sold and/or marketed beginning in the 1970s. The plaintiffs further allege that the defendants knew or should have known the unique dangers that the addition of MTBE to gasoline and other petroleum products posed to groundwater supplies as early as the 1970s. According to the plaintiffs, MTBE contamination was an inevitable result of the defendants' intentional and negligent conduct. The plaintiffs further allege that the defendants misled Congress and the public of the dangers posed by MTBE and increased the amount of MTBE in their products, despite knowledge of the hazards it posed. Plaintiffs also allege that MTBE begins to contaminate the groundwater soon after it is released, and that the contamination is continuous, persistent, and ongoing. Although the plaintiffs allege that the MTBE contamination began well before 2003, they also allege that new spills and leaks of the petroleum products containing

MTBE occurred annually at all times relevant to the litigation.

Sabic forwarded copies of the complaints in all eight of the underlying lawsuits to Dallas National with the expectation that it would receive a legal defense and indemnification pursuant to four commercial general-liability insurance policies covering July 2003 to July 2007. Those policies provide in pertinent part:

SECTION I—COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

. . . .

b. This insurance applies to "bodily injury" or "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period. . . .

The policies also include the following relevant definitions:

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

15. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

. . . .

17. "Property Damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The policies, which contain pollution exclusions, also state that they do not apply to bodily injury or property loss "expected or intended from the standpoint of the insured."

Dallas National denied coverage and filed a declaratory-judgment action against Sabic, seeking a determination of Dallas National's rights and obligations under the four policies.[3] Sabic filed its first amended answer and first amended counterclaim, seeking a declaratory judgment against Dallas National to defend and indemnify it as required under the policies. Sabic and Dallas National subsequently filed cross-motions for traditional summary judgment.[4] After hearings on both motions, the trial court signed an order denying Dallas National's motion and granting Sabic's motion on both its duty-to-defend and duty-to-indemnify issues. The trial court subsequently set aside the order and

signed a second order granting Sabic's motion with respect to the duty-to-defend issue only, denying Dallas National's motion on both its duty-to-defend and duty-to-indemnify issues, and declaring that Dallas National was obligated to defend Sabic in the underlying lawsuits and reimburse Sabic for any defense costs it incurred as a result. The court also severed Sabic's breach-of-contract and attorney's-fee claims. This appeal followed.

## Discussion

Dallas National raises one issue: whether the trial court erred in declaring that Dallas National was obligated to defend Sabic in the underlying lawsuits and indemnify Sabic for any associated costs with its defense. Dallas National raises the following arguments in support of its position:

1. whether Sabic's summary judgment motion and evidence were insufficient as a matter of law to show "property damage" that occurred during any policy period;

2. whether the underlying lawsuits alleged an "occurrence" under the policies;

3. whether the fortuity doctrine barred coverage for the underlying lawsuits;

4. whether coverage was excluded under the expected or intended exclusion contained within the policies;

5. whether coverage was excluded under the pollution exclusion; and

---

**3.** *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.003(a) (West 2009).

**4.** On December 20, 2007, Dallas National filed its opposition to Sabic's motion for summary judgment, and Sabic filed its reply to Dallas National's objections on January 3, 2008. Sabic filed its objections to Dallas Na-

tional's motion for summary judgment on January 11, 2008. On March 7, 2008, Dallas National filed its supplemental brief in support of its motion for summary judgment, and Sabic responded to the supplemental brief on March 14, 2008.

6. whether the underlying lawsuits in Florida alleged "property damage."

### Standard of Review

We review a trial court's decision to grant or to deny a motion for summary judgment de novo. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex.2007). Although a denial of summary judgment is not normally reviewable, we may review such a denial when both parties move for summary judgment and the trial court grants one motion and denies the other. *Id.* In our review of such cross-motions, we review the summary judgment evidence presented by each party, determine all questions presented, and render the judgment that the trial court should have rendered. *Id.* (citing *Comm'r Court v. Agan*, 940 S.W.2d 77, 81 (Tex.1997)).

Under the traditional summary judgment standard, the movant has the burden to show that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX.R. CIV. P 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true, and every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon*, 690 S.W.2d at 548–49. A defendant moving for summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of its cross-claim or affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997).

### Duty to Defend

An insurer's duty to defend is determined by the allegations in the pleadings and the language of the insurance policy. *See Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 495 (Tex. 2008) (applying "eight-corners" rule to determinations regarding duty to defend). We resolve all doubts regarding the duty to defend in favor of the duty, and we construe the pleadings liberally. *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex.2008); *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex.2002); *see also AccuFleet, Inc. v. Hartford Fire Ins. Co.*, 322 S.W.3d 264, 270 (Tex.App.-Houston [1st Dist.] 2009, no pet.) ("We resolve all doubts regarding the duty to defend in favor of the duty."). In reviewing the underlying pleadings, we focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged. *See Nokia*, 268 S.W.3d at 495; *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 13 (Tex.2007). The insurer's duty to defend arises when pleadings raise allegations that, if taken as true, potentially state a cause of action within the terms of the policy. *Gehan Homes, Ltd. v. Employers Mut. Cas. Co.*, 146 S.W.3d 833, 838 (Tex.App.-Dallas 2004, pet. denied); *Nokia*, 268 S.W.3d at 495. If potential coverage exists "for any portion of the suit, an insurer must defend the entire suit." *Stumph v. Dallas Fire Ins. Co.*, 34 S.W.3d 722, 728 (Tex.App.-Austin 2000, no pet.).

We interpret insurance policies according to the rules of contract construction. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003); *SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's*, 179 S.W.3d 619, 624 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). Our primary goal in doing so is to give effect to the written expression of the parties' intent. *SMI Realty Mgmt. Corp.*, 179 S.W.3d at 624. To this end, we construe the terms of the contract as a whole and

consider all of its terms, not in isolation, but within the context of the contract. *Id.; Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex.1994).

If a contract can be given only one reasonable meaning, it is not ambiguous and will be enforced as written. *See Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). On the other hand, if a contract is susceptible to two or more reasonable interpretations, it is ambiguous. *Id.* Whether a particular provision or the interaction among multiple provisions creates an ambiguity is a question of law. *See Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex.1995). The fact that the parties may disagree about the policy's meaning does not create an ambiguity. *See Kelley–Coppedge, Inc.*, 980 S.W.2d at 465. When an alleged contract ambiguity involves an exclusionary provision of an insurance policy, then we must adopt the construction urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex.1998). The insurer has the burden of proving that a policy limitation or exclusion constitutes an avoidance or an affirmative defense. *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 204 (Tex.2004).

**Insufficient Summary Judgment Evidence—"Property Loss" and "Occurrence"**

Dallas National contends that Sabic's summary judgment motion and evidence were insufficient as a matter of law to show "property damage" that was caused by an "occurrence" that took place during the policy period. Specifically, Dallas National contends that even though the plaintiffs in the underlying lawsuits artfully plead negligence, the pleaded facts (even liberally construed in Sabic's favor) unambiguously allege intentional and knowing conduct rather than negligence. *See Nokia*, 268 S.W.3d at 495 (factual allegations contained in plaintiffs' pleadings control, not alleged cause of action). According to Dallas National, such conduct cannot be considered "accidental," and thus, cannot constitute an "occurrence" as defined by the policies. Dallas National also contends that the pleadings in the underlying lawsuits are insufficient to demonstrate that "property damage" occurred during the policy periods because the pleadings do not allege specific dates when the actual injuries occurred. Finally, Dallas National contends that the Florida lawsuits do not allege "property damage" (actual, physical damage), but rather, damages for loss of consumer confidence, economic losses, and anticipatory or speculative losses.

Having reviewed the pleadings filed in the underlying lawsuits, we conclude the factual allegations raised here support a duty. The pleadings allege both intentional conduct (i.e., the defendants knew of MTBE's harmful effects and nevertheless added MBTE to the petroleum products they manufactured, refined, formulated, distributed, supplied, sold and/or marketed) and negligence (i.e., the defendants should have known of MTBE's harmful effects). The allegations of intentional conduct (which are not covered) are not sufficient to preclude a duty to defend when they are coupled with allegations of negligence (which may be covered), because if coverage exists "for any portion of a suit, an insurer must defend the entire suit." *Stumph*, 34 S.W.3d at 728.

Although the plaintiffs do not allege specific dates when the MTBE contamination occurred, they nonetheless allege that

MTBE begins to contaminate the groundwater soon after it is released, and that the contamination is continuous, persistent, and ongoing. Although the plaintiffs allege that the MTBE contamination began well before 2003, they also allege that new spills and leaks of the petroleum products containing MTBE occurred "annually" "[a]t all times relevant to the litigation"—which includes the years immediately preceding the filing of the underlying lawsuits in March 2007. Under a liberal construction of the factual allegations raised in the pleadings, it is apparent that the plaintiffs allege that new instances of MTBE contamination occurred between July 2003 and July 2007, as a result of annual spills, leaks, and other discharges of the petroleum products containing MTBE into the environment.

Dallas National further contends that the Florida lawsuits do not allege "property damage" (actual, physical damage), but rather, damages for loss of consumer confidence, economic losses, and anticipatory or speculative losses. A review of the pleadings filed in the Florida lawsuits reveals that, although the plaintiffs are seeking damages for such economic losses, they are also seeking compensation for "damages to Plaintiff's property, including wells, pumping stations, filters, and usufructuary rights to the water drawn from the aquifers" caused by the MTBE contamination. Specifically, the plaintiffs allege that the MTBE spreading through the groundwater and water supply system, including plaintiff's production wells, gives the water a "foul taste and odor that renders the water unusable." Having done so, the plaintiffs in the Florida lawsuits have, at a minimum, alleged that the defendants' conduct resulted in the "loss of use of tangible property" (*i.e.,* groundwater rendered unusable for sale due to MTBE contamination).

Construed liberally, the pleadings in the underlying lawsuits allege facts sufficient to show "property damage" was caused by an "occurrence" that took place between July 2003 and July 2007.

**Known–Loss Doctrine**

Dallas National also argues that it does not have a duty to defend Sabic under the known-loss doctrine or the policy's "expected or intended" coverage exclusion. The known-loss doctrine, also known as the "fortuity doctrine," bars coverage for a loss the insured already knows to have occurred, or which is in progress at the inception of the carrier's initial policy. *See, e.g., Scottsdale Ins. Co. v. Travis,* 68 S.W.3d 72, 75 (Tex.App.-Dallas 2001, pet. denied). Specifically, Dallas National contends that, since the plaintiffs in the underlying lawsuits allege that Sabic's wrongful conduct occurred before and after the purchase of the insurance policies, "the known loss doctrine bars coverage and no duty to defend arises."

Dallas National cites to two cases in supports of its claim that the known-loss doctrine bars coverage in the present case: *Scottsdale Ins. Co. v. Travis,* 68 S.W.3d 72 (Tex.App.-Dallas 2001, pet. denied) and *Two Pesos v. Gulf Ins. Co.,* 901 S.W.2d 495, 501 (Tex.App.-Houston [14th Dist.] 1995, no writ). Both *Scottsdale Insurance Co.* and *Two Pesos,* however, are factually distinguishable from the present case. The underlying lawsuits in both *Scottsdale Insurance Co.* and *Two Pesos* only alleged intentional torts; neither petition alleged negligence on the part of the insured. *See Scottsdale Ins. Co.,* 68 S.W.3d at 74 (petition alleged claims for tortuous interference with contract, misappropriation of trade secrets, breach of fiduciary duty, and conversion); *Two Pesos,* 901 S.W.2d at 498 (petition alleged claim for trade-dress infringement). As such, the petitions in both of those cases alleged *only* facts that

the insured was engaged in conduct that was not covered or was excluded by the policy. *See Scottsdale Ins. Co.,* 68 S.W.3d at 75 (stating that, if petition alleges *only* facts not covered or excluded by insurance policy, insurer has no duty to defend).

As previously discussed, the pleadings in the underlying lawsuits allege both intentional conduct (which is not covered) and negligence (which may be covered). Sabic has demonstrated that the underlying lawsuits allege some facts which may support a duty to defend, and Dallas National has failed to refute all possible bases for Sabic's liability in negligence necessary to defeat the contractual duty to defend. *See Stumph,* 34 S.W.3d at 728.

**"Expected or Intended" Coverage Exclusion**

▆ Dallas National argues that it does not have a duty to defend Sabic because the pleadings in the underlying lawsuits allege that Sabic engaged in "intentional conduct resulting in foreseeable damages" and such allegations fall squarely within section I(A)(2)(a) which unambiguously precludes coverage for " '[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured."

Dallas National contends that the plaintiffs in the underlying lawsuits allege that before 2003, the defendants, including Sabic, added MTBE to the petroleum products that they manufactured, refined, formulated, distributed, supplied, sold, and/or marketed, and defendants, including Sabic, knew that the addition of MTBE to those products would cause groundwater contamination—the property damage alleged in the underlying lawsuits. Dallas National further contends that, because the plaintiffs allege that Sabic's conduct was intentional, Sabic's conduct does not qualify as an accident or "occurrence" covered under the policies.

Sabic counters that the plaintiffs in the underlying lawsuits allege both the intentional conduct Dallas National focuses on and negligent conduct which would qualify as an accident or "occurrence" covered under the policies. The plaintiffs in the underlying lawsuits made multiple claims of what Sabic "should have known" about the deleterious effects of MTBE, exposing Sabic to the potential of accident liability resulting from negligence—"occurrences" that fall outside the "expected and intended" exclusion.

Despite allegations of negligence, Dallas National urges this Court to read the pleadings in the underlying suits as alleging "intentional conduct resulting in foreseeable damages" that falls within the "expected or intended" exclusion. Sabic counters that the pleadings make factual allegations that would support the insured's possible liability for negligent conduct that resulted in unintended and unexpected harm, which would qualify as accidents or "occurrences" covered under the policies.

In support, Dallas National cites to *Trinity Universal Insurance Co. v. Cowan* for the proposition that an unexpected or unintended consequence of an intentional tort is not a covered "occurrence" and coverage is excluded for such expected or intended injuries. 945 S.W.2d 819, 827–29 (Tex.1997). Although the *Cowan* court found no "accident" in that case, it declined to hold that deliberate acts may never constitute an accident, citing the example of the hunter who deliberately fires a gun at what he believes to be a deer but is actually a person. *Id.* at 828. Moreover, the duty to defend is not negated by the inclusion of claims that are not covered; rather, it is triggered by the inclusion of any claims that might be covered. *Zurich Am. Ins. Co. v. Nokia, Inc.,* 268 S.W.3d 487, 495–96 (Tex.2008). Even if

some of the claims alleged in the underlying suits are excluded from coverage by the "expected or intended" provision, the inclusion of other claims that might be covered triggers the duty to defend.

**Pollution Exclusion**

■■■ Dallas National also contends that it does not have a duty to defend Sabic in the underlying suits because the pollution exclusions set forth in each of the policies exclude coverage for such losses. Specifically, Dallas National contends that the allegations in the underlying lawsuits fall squarely within section I(A)(2)(f)(2)'s pollution exclusion which unambiguously precludes coverage for "[a]ny loss, cost or expense arising out of any: . . . (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants." According to Dallas National, the plaintiffs in each of the underlying lawsuits are "governmental authorities" for purposes of the policy exclusion.

Sabic counters that the pollution exclusion is ambiguous and therefore, we must adopt the construction of the clause urged by Sabic, "as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex.2008) (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991)). Sabic argues that section I(A)(2)(f)(2) only applies to "clean up" costs and not claims for compensatory damages, like the claims alleged by the plaintiffs in the underlying

suits. Sabic further maintains that the plaintiffs in the underlying lawsuits are quasi-municipal water sellers, not "governmental authorities" under the terms of the pollution exclusion, and urges this Court to interpret the term "governmental authority" as a state or federal agency that has some *authority* to issue and/or enforce environmental cleanup demands or orders. Sabic also contends that, even if the pollution exclusion applies, it is nonetheless covered under the polices, in light of the exception to the pollution exclusion set forth in section I(A)(2)(f)(2).

Section I(A)(2)(f)(2)(a), (b) of the 2004–2005, 2005–2006, and 2006–2007 policies provides that coverage is excluded for "any loss, cost or expense" arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

Section I(A)(2)(f)(2) further provides that "this paragraph does not apply to liability for damages because of 'property damage' that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or 'suit' by or on behalf of a governmental authority." [5]

The term "governmental authority" is undefined by the policy, and we have not found—and the parties have not directed

---

5. The 2003–2004 policy does not contain this exception to the pollution exclusion. Also, unlike the other three policies, the 2003–2004 policy states that coverage is excluded for any loss, cost or expense arising out of any "request, demand or order."

us to—any case law analyzing the types of entities classified as "governmental authorities" for purposes of such exclusions. Although Dallas National argues that cities and municipal water authorities, like the plaintiffs in the underlying lawsuits, have been construed to be "governmental authorities," the cases cited by Dallas National (1) do not involve pollution exclusions contained in commercial general liability insurance policies,[6] (2) involve suits by private parties to recover cleanup costs incurred as result of orders issued by a state environmental protection agency,[7] or (3) involve suits in which the insured was required to pay corrective action damages to a state environmental protection agency.[8]

We agree with Sabic that the term "government authority" is ambiguous as it is used in the policies. Accordingly, we must adopt Sabic's interpretation of this policy provision so long as Sabic's interpretation is not unreasonable. *See Evanston Ins. Co.*, 256 S.W.3d at 668. This is the case even if Dallas National's construction "appears to be more reasonable or a more accurate reflection of the parties' intent." *See id.* We cannot adopt a construction that renders any portion of a policy meaningless, useless, or inexplicable. *ATOFINA Petrochemicals, Inc. v. Cont'l Cas. Co.*, 185 S.W.3d 440, 444 (Tex.2005) (per curiam) (rejecting policy construction that would render coverage illusory); *Kelley-Coppedge, Inc.*, 980 S.W.2d at 464.

Here, Sabic urges this Court to interpret the term "governmental authority" as a governmental agency that has some authority to issue and/or enforce environmental cleanup demands or orders. Dallas National urges us to adopt a broader interpretation of the term "governmental authority" which would essentially encompass any governmental body, regardless of its enforcement capabilities. Neither Sabic's nor Dallas National's interpretations render any portion of the policies meaningless, useless, or inexplicable. Thus, both are reasonable interpretations of the policy term. With regard to exclusionary clauses such as this one, however, the insured's interpretation need not be the *only* reasonable interpretation to prevail; it need only be *a* reasonable interpretation. *See Evanston Ins. Co.*, 256 S.W.3d at 668. Having determined that Sabic's narrower interpretation of the term "government authority" is not unreasonable, we will adopt this interpretation for purposes of our analysis.

The plaintiffs in the underlying lawsuits allege that they are "municipal corpora-

---

**6.** *Baycol, Inc. v. Downtown Dev. Auth.*, 315 So.2d 451, 461 (Fla.1975) (recognizing municipality as type of government authority); *City of Hollywood v. Yarborough*, 274 So.2d 526, 528 (Fla.1973) (same); *Philbrick v. City of Miami Beach*, 147 Fla. 538, 3 So.2d 144, 145 (1941) (considering City of Miami a governmental authority); *Browne v. City of Miami*, 948 So.2d 792, 794 (Fla.Dist.Ct.App.2006) (describing City of Miami as "local governmental authority").

**7.** *Nascimento v. Preferred Mut. Ins. Co.*, 513 F.3d 273, 274 (1st Cir.2008) (suit brought by private party to recover costs associated with cleaning up oil that had leaked from defendant's underground storage tank in response to Notice of Responsibility order issued by Massachusetts Department of Environmental Protection to plaintiffs and defendant ordering them to clean up spill); *Utica Mut. Ins. Co. v. Weathermark Invs., Inc.*, 292 F.3d 77, 79 (1st Cir.2002) (suit brought by private party in response to Notice of Responsibility order issued by Massachusetts Department of Environmental Protection ordering party to respond to oil leak).

**8.** *Mont. Petroleum Tank Release Bd. v. Crumleys, Inc.*, 2006 Mont. Dist. LEXIS 38, 1–2 (Mont.Dist.Ct.2006); *Mont. Petroleum Tank Release Bd. v. Great Am. Alliance Ins.*, 2006 Mont. Dist. LEXIS 510 (Mont.Dist.Ct.2006).

tion[s] comprising the habitants within [their] boundaries." They further allege that they possess powers "conferred upon them by law," without specifying any law, and that they have "inherent authority" to "preserve or benefit the corporate property," and to "maintain actions to recover damages to corporate property." The plaintiffs do not allege that they have any authority to demand or compel the cleanup of such corporate property, or that any governmental authority has actually requested, demanded, or otherwise ordered any entity to respond in any way to, or assess the effects of, MTBE in the environment. It is apparent from the pleadings in the underlying lawsuits that the plaintiffs in those cases filed suit to recover for damages to their property, just as any other property owner would be entitled to do. They are not acting in any type of governmental capacity. Accordingly, the plaintiffs are not "government authorities" as contemplated by the policies, and we therefore conclude that the pollution exclusions do not preclude Dallas National's duty to defend Sabic in the underlying lawsuits.

Because we hold the claims in the underlying lawsuits against Sabic are not excluded from coverage by the pollution exclusions contained in Dallas National's policies, we need not address whether such claims fall within the exception to the exclusion contained in the 2004–2007 policies.

### Conclusion

We affirm the trial court's summary judgment.