Opinion issued March 26, 2015



In The

# Court of Appeals

For The

## First District of Texas

—————————————

## NO. 01-11-00995-CV

—————————————

### PRIME NATURAL RESOURCES, INC., Appellant

### V.

### CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SYNDICATE NUMBERS 2020, 1084, 2001, 457, 510, 2791, 2987, 3000, 1221, 5000, AND NAVIGATORS INSURANCE CO. UK, Appellees

On Appeal from the 129th District Court
Harris County, Texas
Trial Court Case No. 2007-56696

## MEMORANDUM OPINION

Appellant, Prime Natural Resources, Inc. ("Prime"), challenges the trial court's rendition of summary judgment in favor of appellees, a group of

underwriters at Lloyd's of London, namely, Lloyds's of London Syndicate Numbers 2020, 1084, 2001, 457, 510, 2791, 2987, 3000, 1221, and 5000 and Navigators Insurance Co. UK (collectively, "Underwriters"), in Underwriters' counterclaim for a declaration regarding their coverage obligations under two essentially identical insurance policies, numbers 203794 and 203796 (jointly, the "Policy"). In two issues, Prime contends that the trial court erred in granting summary judgment in favor of Underwriters.

We affirm.

## Background

In its Third Amended Petition, Prime alleged that Underwriters issued to it the Policy, a "Wellsure Energy Package" policy, to insure Prime's various oil and gas drilling interests and operations in the Gulf of Mexico for the period of April 1, 2005 to April 1, 2006. Among other interests, the Policy expressly insured an offshore well, the "H-2 Well," and an adjacent platform, the "H-Platform." Both the H-2 Well and the H-Platform were significantly damaged by Hurricane Rita during the policy period.

The H-2 Well, located about 75 miles south-southeast of Morgan City off the Louisiana coast in an area called Ship Shoal Block 148 ("SS 148"), is a single well that stood alone adjacent to the H-Platform. F-W Oil Interests ("F-W") and Phillips Petroleum ("Phillips") divided the working interest in the H-2 Well

2

equally. Phillips, the operator, drilled the H-2 Well, set up the H-Platform, and built pipelines between the H-2 Well and the H-Platform and to a nearby Phillips facility. Subsequently, F-W conveyed its 50% working interest to Prime, and Phillips conveyed its 50% working interest to W&T Offshore, Inc. ("W&T").

In September 2005, the forces of Hurricane Rita bent the H-2 Well about seven feet above the mudline, toppled the H-Platform away from the H-2 Well, and damaged the attached pipeline. W&T, as the operator, issued authorizations for expenditures and joint interest billings to Prime for the "wreck and debris cleanup at [SS] 148, recompleting and restoring the [H-2 Well], re-establishing connection to the [H-2 Well] bore, and ultimately, rebuilding the SS 148" H-Platform.

Prime further alleged that the "costs associated with the completion" of W&T's activities, "all of which were necessary to place the [H-2 Well] back into a comparable pre-loss condition, either have, or are anticipated to, exceed $17,000,000 on a 100% joint operating basis." And of this amount, "in excess of $4,000,000 has been expended for debris removal and the rebuilding of the [H-Platform]." According to Prime, the Policy provided "coverage for *all costs* incurred by [it] in the restoration of the [SS 148] Complex," including "*all costs and actual expenses* incurred in recompleting the [SS 148 H-2 Well] and *getting it back into production* as a result of the damage covered by [or] of the result of Hurricane Rita." (Emphasis added.)

Asserting that the above incurred costs and expenses were "unambiguously covered under the terms, conditions and coverage grant contained in the Policy," Prime alleged that Underwriters "have breached the Policy by failing and/or refusing to indemnify Prime . . . ." Specifically, it asserted that, "[p]ursuant to Section IB [entitled, "Expenses of Redrilling/Recompletion"] and other relevant provisions of the Policy, Underwriters have a clear duty to indemnify Prime for the costs and/or expenses associated with the wreck and debris clean up at [SS 148 H-2 Well]," including "*rebuilding* the [H-Platform], reestablishing the connection to the [H-2 Well] bore, and *recompleting and restoring* the [H-2 Well] to its comparable pre-loss condition." (Emphasis added.)

On its claim for breach of contract, Prime sought actual damages of approximately "$4.7 million in proceeds under" the Policy, consequential damages for "sustained lost business opportunities and lost profits, and its attorneys' fees."

In their Amended Counterclaim for Declaratory Judgment, Underwriters alleged that they "determined the [H-Platform] to be a constructive total loss and, in accordance with coverage limits available under the Policy, made a payment to [Prime] in the amount of $900,000 for its 50% interest of the replacement cost value of the [H-Platform]," which "exhausted Policy limits available for the [H-Platform] for physical damage." Underwriters also paid Prime "$225,000, equal to the applicable coverage limit under the Policy (25% of replacement-cost value) for

4

the costs of debris removal associated with the [H-Platform]," which "exhausted Policy limits available for the [H-Platform] debris removal." And Underwriters further paid Prime "$2,880,866, equal to the applicable Policy limits for covered claims arising from pipeline damage and debris removal, as well as well-redrill operations."

Underwriters further alleged, thus, that they had in fact paid Prime for "all of [its] covered loses related to the SS 148 [H-Platform], associated pipelines and [H-2 Well] redrill." In other words, they "have *paid the limits of coverage* available under the Policy for [Prime's] platform and pipeline physical-damage and debris-removal claims." (Emphasis added.) And they asserted that Prime, in suing them, was attempting to recover "additional physical-damage and debris-removal coverage for the replacement, repair and or refurbishment of the [H-Platform] and top-side equipment."

Underwriters sought from the trial court a declaration that "they are not obligated under the Policy's Section IB for any additional costs or expenses incurred to replace, repair and/or refurbish the [H-Platform]." They also sought to recover their attorneys' fees.

Both Prime and Underwriters filed cross-motions for partial summary judgment concerning the Policy's coverage. Underwriters also filed several motions for summary judgment in which they argued that because the

unambiguous language of Section IA, entitled, "Control of Well Insurance," including a "Making Wells Safe Endorsement," and Section IB of the Policy provided coverage only for wells, not platforms, Prime's unreimbursed costs and expenses, which consisted only of excess platform-damage and debris-removal costs, are not covered by the Policy. They also asserted that Section II of the Policy, entitled "Physical Loss or Physical Damage," provided coverage for the H-Platform, pipelines, and removal of debris. Underwriters, in a no-evidence summary-judgment motion, further argued that the Making Wells Safe Endorsement is inapplicable because "Prime has offered no evidence that the [H-2 Well] was at risk of becoming out of control." In response, Prime argued that because all of its unreimbursed expenses are covered by Section IA, the Making Wells Safe Endorsement, and/or Section IB of the Policy, it was entitled to summary judgment on its claim for breach of contract.

After a hearing, the trial court issued an interlocutory order granting Underwriters' pending "Motions for Summary Judgment concerning coverage under [the] Policy" and declaring that:

    a. Coverage under Section II of the Policy (for Physical Loss and Physical Damage to the H platform and removal of debris of the H platform) is limited in an amount to the Policy's scheduled limits for platforms/caissons, pipelines and debris removal. Costs incurred by Prime to repair/refurbish the H platform or remove the

6

platform debris in excess of the Policy limits are not covered under Section II.[1]

b. Section IB of the Policy (Expense of Redrilling/Recompleting) does not provide coverage for costs incurred to replace, repair or refurbish the H platform or platform equipment or to remove H platform debris; and

c. Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H platform or remove H platform debris.

Prime and Underwriters subsequently non-suited their remaining claims against one another without prejudice, and the trial court expressly incorporated the above interlocutory order into a final judgment. In doing so, the trial court expressly stated that its final judgment is limited to the claims underlying the interlocutory order and "shall not be interpreted or construed as an adjudication on the merits of any cause of action or claim that has been non-suited without prejudice by Prime and/or Underwriters prior to the entry of this Final Judgment."

**Standard of Review**

Appellate courts review declaratory judgments rendered by summary judgment under the same standards that govern summary judgments generally. *Bowers v. Taylor*, 263 S.W.3d 260, 264 (Tex. App.—Houston [1st Dist.] 2007, no pet.). And we review de novo a trial court's ruling on a summary-judgment

---

[1] Prime is not challenging the trial court's interpretation of Section II.

motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

To prevail on a summary-judgment motion, a movant has the burden of establishing that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a plaintiff moves for summary judgment on its own claim, it must conclusively prove all essential elements of its cause of action. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341; *Yazdchi v. Bank One, Tex., N.A.*, 177 S.W.3d 399, 404 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in its favor. *Id.* at 549.

When, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment proof

presented by both sides and determine all questions presented. *See Centerpoint Energy Hous. Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 430 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

**Insurance Coverage**

In two issues, Prime argues that the trial court erred in granting Underwriters summary judgment and declaring that Sections IA and IB of the Policy did not provide it coverage for costs incurred to replace, repair, or refurbish the H-Platform or platform equipment, or to remove H-Platform debris, because "it failed to recognize the coverages under" these sections "unambiguously provide coverage for the outstanding portion of [its] claim." Underwriters assert that they have "already paid Prime the maximum amount recoverable" under the Policy "for repair of the H-Platform and removal of debris" and the "trial court properly declared that Sections IA and IB well coverage do not extend to reimburse Prime's extra costs for platform replacement/repair/refurbishment or platform debris removal."

The rules governing interpretation of contracts, in general, apply to interpreting insurance policies. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's*, *London*, 327 S.W.3d 118, 126 (Tex. 2010). When construing an insurance policy, a court's primary concern is to give effect to the written expression of the parties' intent. *Mid–Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323

S.W.3d 151, 154 (Tex. 2010). We examine the entire policy and seek to harmonize and give effect to all provisions so that none will be meaningless or inoperative. *Gilbert Tex. Constr.*, 327 S.W.3d at 126; *see also State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) ("Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract."). The policy's terms are given their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense. *Gilbert Tex. Constr.*, 327 S.W.3d at 126.

If an insurance policy uses unambiguous language, we must enforce it as written. *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008). Mere lack of clarity does not create an ambiguity. *Universal Health Servs., Inc. v. Renaissance Women's Group P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). Only if the policy is subject to two or more reasonable interpretations may it be considered ambiguous. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010). Terms in an insurance policy that are subject to more than one reasonable construction are interpreted in favor of coverage. *Gilbert Tex. Constr.*, 327 S.W.3d at 133. Even if parties interpret a policy differently, an insurance contract having a clear and definite meaning is not ambiguous as a matter of law. *Mid–Continent Cas.*, 323 S.W.3d at 154 (citations omitted). Whether a contract is ambiguous is a

10

question of law.  *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).  Likewise, we review a trial court's interpretation of a contract de novo. *See MCI Telecomms. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999).

When an alleged contract ambiguity involves an exclusionary provision of an insurance policy, we must adopt the construction urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent. *See Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008) (citing *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)); *see also Dallas Nat'l Ins. Co. v. Sabic Ams., Inc.*, 355 S.W.3d 111, 117 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "'Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured,' and '[a]n intent to exclude coverage must be expressed in clear and unambiguous language.'"  *Evanston Ins.*, 256 S.W.3d at 668 (quoting *Nat'l Union Fire Ins.*, 811 S.W.2d at 555).

***The Policy***

On the Policy's "Package Declarations" page, which summarizes the contents of the entire Policy, including coverage limits and deductibles, there are, under the title "Coverage," four scheduled sections:  Section I (a), "Operator's

11

Extra Expense"; Section I (b), "Oil Spill Financial Responsibility"; Section II, "Physical Loss or Physical Damage"; and Section III, "Builder's Risk."

There are three sections under Section I (a): Section IA, "Control of Well Insurance," which covers costs incurred to regain control of any well that gets out of control; Section IB, "Redrilling/Recompletion Insurance," which covers costs incurred to re-drill or restore a well damaged by specified perils; and Section IC, "Cleanup Expenses and Seepage, Pollution and Contamination Insurance." Under Section I (a), "[o]perations" include "Oil and/or gas and/or thermal energy and/or salt water disposal *wells* and/or injection *wells* and or water supply *wells* in Areas 1, 2 Land, 2 Wet and 3." (Emphasis added.) There are two sections under Section II: Section IIA, "Platforms/Caissons," and Section II B, "Pipelines/Flowlines." The trial court's declarations concern only Sections IA and IB of Section I (a) and Section IIA of Section II.

### *Section I (a) - Operator's Extra Expenses*

Section I (a) insured all manners of wells, both onshore and offshore, provided said wells were identified on a schedule submitted by Prime and the appropriate premium was paid for the well.[2] And it afforded $50 million in coverage as a combined single limit for Sections IA, IB, and IC.

---

[2] The Policy's "General Conditions," which applied to Section I, defined the term "Well(s) Insured" as "oil and/or gas and/or thermal energy wells and/or salt water disposal wells and/or injection wells and/or water supply wells that come at risk

In regard to the Control-of-Well Insurance, paragraph 1 of Section IA provides, in pertinent part, as follows:

> Underwriters agree subject to the terms and conditions of this [Policy], to reimburse [Prime] for actual costs and/or expenses incurred by [Prime]: (a) in *regaining control of all well(s)* insured hereunder *which get out of control*, including any other well or hole which gets out of control as a direct result of a well insured hereunder getting out of control; (b) in extinguishing fire in or from such well(s) or which may endanger the well(s) insured hereunder; and (c) for removal of wreckage and/or debris of property of [Prime] owned or leased in whole or in part, resulting from a loss insured in (a) or (b) above provided removal and/or destruction is required by a legal or contractual obligation of [Prime], provided, however, that from any such claim for costs and/or expenses shall be deducted the value of any property salvaged or recovered inuring finally and irrevocably to the benefit of [Prime].

(Emphasis added.) The term "well out of control" is defined as follows:

> A well(s) shall be deemed to be out of control when there is a continuous unintended, uncontrolled flow of drilling fluid, oil, gas and/or water from the well, above the surface of the earth and/or waterbottom or when it is declared to be out of control by the appropriate regulatory authority.

Section IA further provides that "expenses" recoverable under this section "include costs of materials and supplies required, the services of individuals or firms specializing in controlling wells and extinguishing fires, and directional

---

on or after the inception date of this Certificate while being drilled, deepened, serviced, worked over, completed and/or reconditioned until completion or abandonment . . . and as may be included within the areas and types of wells insured as set forth in the Declarations hereto." This definition also included "all of [Prime's] scheduled producing and shut-in wells (which include[d] plugged, cemented and abandoned wells) provided that the schedule of these wells [was] on file with Global Special Risks, Inc. and an appropriate premium [was] paid."

drilling and similar operations *necessary to bring the well(s) under control*, including costs and expenses incurred at the direction of regulatory authorities to bring the well(s) under control and other expenses included within Paragraph 1 above." (Emphasis added.) Section IA also contains the following express exclusion: "Notwithstanding anything to the contrary which may be contained in these clauses, Underwriters shall have no liability under this Section in respect of . . . *loss or damage to property*." (Emphasis added.)

Prime paid an additional premium for the Making Wells Safe Endorsement, which applied to Section IA. The endorsement provided additional coverage for "actual costs and expenses incurred in preventing" a blowout or out-of-control well "when the drilling and/or workover and/or production equipment has been directly lost or damaged" by specifically enumerated risks, including windstorm. However, it applied "only when, in accordance with all regulations, requirements and normal and customary practices in the industry, it [was] necessary to reenter the original well(s) in order to continue operations or restore production from or plug and abandon such well(s)." And Underwriters' liability for costs and expenses incurred by reason of the endorsement ceased at the time that (1) "operations or production [could] be safely resumed" or (2) "the well is or [could] be safely plugged and abandoned," whichever occurred first.

In regard to Redrilling/Recompletion Insurance, paragraph 1 of Section IB provides, in pertinent part, as follows:

> Underwriters agree, subject to the terms and conditions of this [Policy], to reimburse [Prime] for actual expenses incurred by [Prime] including all in-hole equipment (including casing) owned by [Prime] in redrilling, recompletion, washover, fishing and/or any other salvage operations *as may be necessary to recover or restore any well* which may be lost or damaged as a result of:
>
> A.    an occurrence insured against in Section IA of this insurance; or
>
> B.    loss of or damage to the drilling and/or work over and/or production equipment by lightning; fire, explosion or implosion above the surface of the ground or water bottom; collision with land, sea or air conveyance or vehicle; windstorm; collapse of derrick or mast; flood; strikes; riots; civil commotions or malicious damage; *and where covered under Section IA*, earthquake, volcanic eruption or tidal wave; and in respect of offshore wells only, collision or impact of anchors, chains, trawlboards or fishing nets.
>
> and which cannot be recovered or restored by means other than redrilling and/or recompletion. Actual expenses for redrilling or recompletion shall be limited to the depth of the well and "comparable condition" that existed prior to the loss.

(Emphasis added.)

Section IB also contains the following express exclusion:

> Notwithstanding anything to the contrary which may be contained in these clauses, *there shall be no liability under this Section in respect of*:

A. Bodily injury, illness, disease, death, Worker's Compensation, loss of drillstem, *damage to any part of contractor's drilling rig and equipment, loss or damage to property*, loss of production and all fishing costs (except such fishing costs incurred in connection with redrilling/reconditioning).

B. Redrilling and/or recompletion or for in-hole equipment in respect of any well that was plugged and abandoned by [Prime] prior to loss or damage hereunder.

(Emphasis added.) Section IB further provides that "Underwriters' liability cease[d] when a lost or damaged well [was] restored to the original depth and comparable condition that existed prior to the well becoming out of control, on fire or lost or damaged as the result of the peril or perils insured" in Section IB.

*Section II - Physical Loss or Physical Damage*

Section IIA, entitled "London Standard Platform Form," provided "all risks" property coverage for physical loss or damage to platforms, but it expressly did not apply to "[w]ell(s) and/or hole(s) whilst being drilled or otherwise." It scheduled the replacement cost of the H-Platform at $1,800,000, 50% of which corresponded to Prime's interest, or $900,000. It also scheduled $225,000 for Prime's interest for platform-related debris removal. Section IIB, entitled "Pipeline Form," provided "all risks" coverage for pipelines.

Prime paid an additional premium for a "Removal of Wreckage or Debris Endorsement, which applied to Section II. The endorsement provided additional coverage for:

16

all costs or expenses of, or incidental to the actual or attempted raising, removal or destruction of the wreckage and/or debris of the property insured hereunder (such wreckage or debris resulting from loss or damage to the property insured hereunder as a result of a peril insured against in this insurance) including the provision and maintenance of lights, markings, and audible warnings when such removal is compulsory by law or ordinance or is by contractual obligation or when [Prime] may not or cannot, for practicability of [Prime's] Operations at the site in question, abandon the wreckage or debris, provided, however, that from any such claim for costs or expenses shall be deducted the value of property salvaged or recovered inuring to the benefit of [Prime].

Prime's liability under this extension of coverage was "not [to] exceed in any one accident an additional 25% limit per item insured/amount stated."

### *Redrilling and Recompletion Insurance*

In its first issue, Prime specifically argues that the trial court erred in determining, as a matter of law, that "the costs incurred by Prime in restoring the [H-2] Well to its pre-loss, producing condition were not covered under Section IB of the [Policy]" because Section IB, "by its plain and unambiguous language, provide[d] coverage for actual expenses incurred by [Prime] for those recompletion and salvage operations necessary to recover an insured well." It asserts that it "incurred such costs to restore the [H-2] Well to its pre-loss condition," including "those appurtenances necessary for production," like the H-Platform. Prime further asserts that the "restoration of a producing well to its pre-loss condition consists of more than simply ensuring the hole exists at the same depth" and "[r]ecompletion and restoration of a producing well entails

17

*guaranteeing all the equipment and appurtenances necessary to receive the well's production are in place and functioning*." (Emphasis added.)

The plain language of Section IB covered expenses incurred in recompletion efforts and salvage operations to restore an insured "well" that was lost or damaged by specified perils, including windstorm, to its pre-loss condition. Underwriters specifically agreed "to reimburse [Prime] for actual expenses incurred by [Prime] including all in-hole equipment (including casing) owned by [Prime] in redrilling, recompletion, washover, fishing and/or any other salvage operations as [were] necessary to recover or restore any *well* which [was] lost or damaged as a result of" a specified peril, including windstorm. (Emphasis added.) "Actual expenses for redrilling or recompletion" were "limited to the depth of the well and comparable condition that existed prior to the loss."

Even though the term "well" is not defined in the Policy,[3] it is commonly understood to mean "the hole made by the drilling bit, which can be open, cased, or both. Also called borehole, hole, or wellbore." PETROLEUM EXTENSION SERVICE OF THE UNIVERSITY OF TEXAS AT AUSTIN (PETEX), A DICTIONARY FOR THE OIL & GAS INDUSTRY (1st ed. 2005); BLACK'S LAW DICTIONARY 1732 (9th ed. 2009) ("A hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or

---

[3] As noted above, the Policy's "General Conditions," which applied to Section I, defined the term "Well(s) Insured" as "oil and/or gas . . . wells . . . that come at risk on or after the inception date of this Certificate while being drilled, deepened, serviced, worked over, completed and/or reconditioned . . . ."

natural gas."). Thus, the term "well" is not commonly understood, in the industry or otherwise, to include a production platform or other "appurtenances" associated with the well itself, as asserted by Prime. *See Gilbert Tex. Constr.*, 327 S.W.3d at 126 (stating insurance policy's terms given their ordinary and generally accepted meaning unless policy shows words actually meant in technical or different sense).

Prime argues that because the H-2 Well was producing prior to the loss, Section IB covered all costs incurred by Prime to restore the H-2 Well to production, including costs and expenses associated with the removal of the old platform or the construction of a replacement platform, so long as those activities were necessary to restore the H-2 Well to production, i.e., the well's pre-loss condition. Prime further argues that interpreting the term "well" as merely "the hole made by the drilling bit" renders Section IB's "comparable condition" requirement superfluous because a producing well is more than a hole in the ground.

Section IB expressly obligated Underwriters to only "reimburse [Prime] for actual expenses incurred by [Prime] *including all in-hole equipment* (including casing) owned by [Prime]." (Emphasis added.) As Underwriters' counsel argued to the trial court, restoring the actual "well" to its comparable, pre-loss condition, simply involved restoring the well's internal components, i.e., the type, kind and location of the casing set, the number of liners, and any sand screens.

19

Thus, using the ordinary and common meaning of the term "well" does not render the "comparable condition" requirement of Section IB superfluous or meaningless. *See id.* (stating courts should seek to harmonize and give effect to all policy provisions so none rendered meaningless or inoperative).

Prime also argues that because Section IB provided coverage for costs for "salvage operations as may be necessary to recover or restore" a well, it necessarily covered the costs and expenses associated with the removal of the debris and wreckage of the H-Platform (which actually fell away from the well). Section IB did provide coverage for "salvage operations" necessary to recover or restore a well. However, Section IB did not provide coverage over and above the amount of coverage that Prime purchased through the Removal of Wreckage or Debris Endorsement as it applied to platform damage under Section IIA.

The terms "salvage" and "debris" do not have the same meaning. Because "debris" and "salvage" are not defined in the policy, we apply their common meanings. *See Don's Bldg. Supply*, 267 S.W.3d at 23 ("Policy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning.").

"Debris" is commonly understood to mean rubbish or "refuse." THE NEW OXFORD AM. DICTIONARY 439 (1st ed. 2001). In contrast, "salvage" means the act of "sav[ing]" or "preserv[ing]" something of value. *Id.* at 1507. Because a plain

20

reading of the words "debris" and "salvage" confirms that they have different meanings, we cannot use them interchangeably. Indeed, the Policy does not use the terms interchangeably. The Removal of Wreckage or Debris Endorsement, concerning Section IIA, platform damage, and Section IIB, pipeline damage, specifically refers to coverage for removal of "wreckage and/or debris." And the "Removal of Wreck/Debris" Endorsement, which applies to Section III of the Policy, provides similar coverage. These endorsements use the term "debris" synonymously with refuse and provide specific coverage for its removal.

In contrast, the General Conditions of Section I contain a separate section entitled "Recovery and Salvage," which recognizes that, unlike "debris," the term "salvage" connotes value. It provides that "[a]ny salvage or other recovery including recovery through subrogation proceedings, after expenses incurred are deducted, shall accrue entirely to the benefit of the Underwriters until the sum paid by the Underwriters has been recovered." Section IC contains a similar provision for "Application of Salvage."

The term "salvage operations," as used in Section IB specifically concerns salvaging a "well," and it cannot be reasonably read as including the removal of the debris and wreckage of the H-Platform, which was specifically covered under the Removal of Wreckage or Debris Endorsement as it concerned Section IIA, platform damage. It would not be reasonable for us to interpret the terms "salvage

21

operations" and "debris removal" to have the same meaning because such an interpretation would render one or the other term meaningless or redundant. *See Cherokee Water Co. v. Freeman*, 33 S.W.3d 349, 354 (Tex. App.—Texarkana 2000, no pet.) (holding construing different terms to have same meaning would render one term meaningless).

Accordingly, we hold that the trial court did not err in granting summary judgment by declaring that "Section IB of the Policy (Expense of Redrilling/Recompleting) does not provide coverage for costs incurred to replace, repair or refurbish the [H-Platform] or platform equipment or to remove [H-Platform debris."[4]

We overrule Prime's first issue.

### Control of Well Insurance and Making Wells Safe Endorsement

In its second issue, Prime specifically argues that the trial court erred in determining, as a matter of law, that Prime "*incurred no costs* to ensure its severely damaged [H-2] Well did not become out of control such that none of its costs would be covered under Section IA and the Making Wells Safe Endorsement of the [Policy]" because "the plain language of . . . Section IA and the Making Wells Safe Endorsement" do not restrict coverage "to those instances in which the well

---

[4]     The question of whether the costs and expenses actually incurred by Prime can be classified as falling within one or more of these excluded types of costs and expenses was not before the trial court and is not before this Court on appeal.

actually . . . becomes out of control." (Emphasis added.) Prime asserts that it presented summary-judgment evidence that demonstrated that "it incurred substantial costs in order to ensure the damaged [H-2] Well did not become out of control." It also asserts that the trial court "implicitly determined Underwriter's classification of Prime's costs were correct."

However, the trial court, in its judgment, simply and narrowly declared:

> Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H-Platform or remove H-Platform debris.

Although Prime frames its issue in terms of whether it incurred certain costs, the trial court made no determination, either explicitly or implicitly, as to whether Prime actually incurred such costs. Nor did it make any determination about how Underwriters had classified Prime's costs. As is readily apparent from the express language of the trial court's judgment, it merely declared that *certain specific costs*—described as costs to replace, repair, or refurbish the H-Platform, or remove the H-Platform debris—were not covered under Section IA or the Making Wells Safe Endorsement.

As noted above, Underwriters, in Section IA of the Policy, entitled "Control of Well Insurance," agreed to reimburse Prime for actual costs, expenses, or both incurred by [Prime]:

> (a)     in *regaining control of all well(s)* insured hereunder *which get out of control*, including any other well or hole which gets out

23

of control as a direct result of a well insured hereunder getting out of control;

(b) in extinguishing fire in or from *such well(s) or which may endanger the well(s)* insured hereunder; and

(c) for removal of wreckage and/or debris of property of [Prime] owned or leased in whole or in part, *resulting from a loss insured in (a) or (b) above provided removal and/or destruction is required by a legal or contractual obligation of [Prime]*, provided, however, that from any such claim for costs and/or expenses shall be deducted the value of any property salvaged or recovered inuring finally and irrevocably to the benefit of [Prime].

(Emphasis added.) The Policy deemed a well to be out of control "when there [was] a continuous unintended, uncontrolled flow of drilling fluid, oil, gas and/or water from the well, above the surface of the earth and/or waterbottom or when it [was] declared to be out of control by the appropriate regulatory authority." And Section IA expressly excluded "loss or damage to property."

Also, as noted above, the "Making Wells Safe Endorsement," which applied to Section IA, provided Prime additional coverage for "actual costs and expenses" incurred in "preventing" a blowout or well out of control "when the drilling and/or workover and/or production equipment has been directly lost or damaged" by specifically enumerated risks, including windstorm. However, it applied "only when, in accordance with all regulations, requirements and normal and customary practices in the industry, it [was] necessary to reenter the original well(s) in order to continue operations or restore production from or plug and abandon such

24

well(s)." And Underwriters' liability for such costs and expenses incurred by reason of the endorsement ceased at the time that (1) "operations or production [could] be safely resumed" or (2) "the well is or [could] be safely plugged and abandoned," whichever occurred first.

The trial court's declaration that Section IA, and specifically the Making Wells Safe Endorsement, did "not provide coverage for costs to replace, repair or refurbish the [H-Platform] or remove [H-Platform] debris" is not in any way inconsistent with the express language of the section or the endorsement. Indeed, the trial court's declaration is consistent with Section IA and the endorsement, especially when read in the context of the entire Policy.

Regardless, in its brief, Prime asserts that although it has "never contended the [H-2] Well was, at any time, 'out of control,' as that term is [used in] Section IA," it incurred various costs to prevent the H-2 Well "from becoming out of control." It further asserts that it was required to retain the services of well-control experts, the Making Wells Safe Endorsement "enables an insured to be proactive in preventing a well control loss," and Sections I and II of the Policy are "not mutually exclusive." And Prime asserts that fact issues precluded summary judgment, highlighting and analyzing the affidavit testimony of certain witnesses.

However, nowhere in its brief does Prime explain how Section IA and the Making Wells Safe Endorsement actually "provide[d] coverage for costs to

replace, repair or refurbish the [H-Platform] or remove [H-Platform] debris," contrary to the trial court's narrow and specific declaration.  In fact, Section IIA, entitled "London Standard Platform Form," provided "all risks" property coverage for physical loss or damage to the H-Platform, and it specifically scheduled $225,000 for Prime's interest for platform-related debris removal.  And although Prime paid an additional premium for a Removal of Wreckage or Debris Endorsement, which applied to Section II, and, thus, the H-Platform,  Prime does not complain that Underwriters failed to indemnify it, as per the Policy's terms and limits, for its costs and expenses related to the H-Platform.

In its reply brief, Prime further argues that "at a minimum, a fact issue existed regarding whether Prime incurred costs under Section IA" because it presented to the trial court as summary-judgment evidence the affidavit of Andy Scott, an employee of well operator W&T.  Prime specifically relies on Scott's testimony that the H-2 Well was "at risk for becoming out of control."  However, Prime does not explain how this testimony concerns the H-Platform.  Nor does Prime direct us to any summary-judgment evidence demonstrating that the H-Platform's replacement, repair, or refurbishment, or the removal of the H-Platform's debris was necessary to prevent the H-2 Well from blowing out or becoming out of control.

Focusing on the actual wording of the trial court's judgment concerning Section IA and the Making Wells Safe Endorsement, we conclude that its declaration is consistent with the express language of the section and the endorsement, especially when read in the context of the entire Policy. Accordingly, we hold that the trial court did not err in declaring that "Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H-Platform or remove H-Platform debris."

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings and Brown.[5]

---

[5] The Honorable Jim Sharp, former Justice of this Court, was a member of the Panel and present for argument when this case was submitted. Because his term expired on December 31, 2014, he did not participate in the decision of the case. *See* TEX. R. APP. P. 41.1.